JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Antonio Evans, appeals from a judgment of the Cuyahoga County Court of Common Pleas finding him guilty and sentencing him. For the following reasons, we affirm.
 {¶ 2} The Cuyahoga County Grand Jury indicted Evans on eleven counts: three counts of aggravated robbery, in violation of R.C. 2911.01; three counts of kidnapping (to facilitate the commission of a felony), in violation of R.C. 2905.01(A)(2); three counts of kidnapping (to terrorize or inflict serious physical harm), in violation of R.C.2905.01(A)(3); one count of possession of drugs, in *Page 3 
violation of R.C. 2925.11, and one count of possessing criminal tools, in violation of R.C. 2923.24. The aggravated robbery and kidnapping charges also included one-and three-year firearm specifications. Evans entered a plea of not guilty to the charges.
 SUPPRESSION HEARING {¶ 3} In November 2005, the trial court held a hearing on Evans' oral motion to suppress the evidence related to the drug charges. Detective Larry Russell, a Cleveland Police officer, testified that in June 2005, he, along with Lieutenant Michael Connelly and Detectives Habeeb and Kraynik, executed an arrest warrant on Evans. Before going to Evans' home, they knew that Evans was an East Cleveland auxiliary police officer, and a prior full-time police officer for that city. And a detective from the East Cleveland Police Department had requested that they retrieve Evans' firearm and his badge.
 {¶ 4} When they arrived at Evans' home, Detective Russell said they knocked and announced themselves. Evans answered the door and identified himself. They immediately arrested him, handcuffed him, as well as two other males who were there, and placed them on a couch. Detective Russell explained that he stayed with Evans and the two men while the other officers went to "clear the house" to make sure no one else was in there.
 {¶ 5} Detective Russell asked Evans where his weapon was, and Evans told him that it was "in his closet, in his room." When Detective Russell told Lieutenant *Page 4 
Connelly that Evans' gun was in his closet, the lieutenant told him that he had already seen it in there when he did the sweep. The gun was in plain view on a shelf. They recovered the loaded gun from the closet, which Detective Russell identified in court.
 {¶ 6} At that point, Detective Russell testified that they asked Evans if he would sign a consent form "for any other property that was in the house that pertained to the East Cleveland Police Department, being, you know, the badge or any other items in the house that we needed to get for them." He explained that they wanted to get Evans' consent "[b]ecause we were doing a search for these items and we didn't know what we were going to find in the house."
 {¶ 7} Detective Russell identified a "Consent to Search Form" as State's Exhibit 1, and said that he wrote it. He stated that Evans voluntarily agreed to sign it, and they removed his handcuffs so that he could. The "Consent to Search Form" indicated that Evans signed the form voluntarily, was informed of his constitutional rights, gave the officers written permission to search his entire residence, and remove any property they desired. Lieutenant Connelly also signed the form, as a witness.
 {¶ 8} Detective Russell took part in the search of the home with two of the other officers, while one officer stayed with the three men. He said he searched the closet where the gun was found. He saw a "Glocke plastic box," which he identified in court. He explained that "Glocke is another make of firearm. I didn't know if there *Page 5 
was another firearm in that box or not" because the gun that they recovered earlier was a Smith and Wesson. There were several items inside the box, including "what appeared to be marijuana and cocaine residue," rolling papers, a speed loader for the Glocke, a paycheck stub made out to Evans from East Cleveland, a set of keys, and other miscellaneous items.
 {¶ 9} Detective Russell then identified another smaller box, which he explained had been found on top of the Glocke box. He identified it in court and described it as a yellow box that is "a flip-flop" portable, digital scale that opens. From his past experience, he knew that this type of scale was typically used by narcotics dealers. He explained that when he opened it, he observed what he thought was "cocaine residue, but it actually tested positive for marijuana residue."
 {¶ 10} Beside the Glocke box and the digital scale, Detective Russell said they found a "box of sandwich bags." They recovered this item because "next to a box of narcotics, they are more than likely used for narcotics distribution." He stated they had not opened any of the items prior to receiving written consent from Evans.
 {¶ 11} Detective Russell further testified that they found other items in the house, including Evans' East Cleveland police badge, an Ashtabula Narcotics officer's badge, and a CMHA radio. They also found a black, side holster, and a diamond pattern, quilted, liner-type jacket, which police officers commonly wear.
 {¶ 12} Lieutenant Connelly testified that in June 2005, he was the officer in charge of the Cleveland Police Department Detective Bureau. He explained that he *Page 6 
decided to take part in the arrest of Evans because Evans was a police officer and because his department was short on staff at that time.
 {¶ 13} According to Lieutenant Connelly, Detective Russell stayed with the three men, while he and Detectives Habeeb and Kraynik "cleared the house." He explained that "cleared the house" meant "for our own personal safety, to make sure there was nobody else there that would possibly cause a threat to us." When clearing a house, Lieutenant Connelly said they do not open small containers, but they do open closets, look under stairs, and under beds; they look anywhere "a person can fit."
 {¶ 14} Lieutenant Connelly testified that when he was clearing the house, he opened a closet door in a bedroom and he saw the Smith and Wesson gun in plain view, on a shelf. He stated that he saw some other boxes on the shelf too, but did not touch anything before they obtained consent from Evans.
 {¶ 15} On cross-examination, Lieutenant Connelly testified that he saw the Glocke box next to the Smith and Wesson, but what he really noticed "was the baggies." He admitted that they obtained consent to search, in part, because they were suspicious of drug activity. He said the fact that "somebody has got plastic bags in their closet" made him suspicious of drugs. Lieutenant Connelly explained that Evans readily agreed to sign the form and was cooperative.
 {¶ 16} Evans' two brothers, Christopher and Emanuel Evans, then testified on his behalf. Christopher Evans stated that the officers brought the scale into the living *Page 7 
room, and Antonio told them that is what it was, and then the officers asked Antonio if he would consent to a search. Christopher Evans also said that the officers said to Antonio, "if you don't sign this search warrant, we'll just come back with a search warrant." On cross-examination, Christopher Evans said that the item the officers brought into the living room was a black box and his brother called it a scale.
 {¶ 17} Emmanuel Evans testified that after the officers went "shuffling in the back," one of them came out with a "black box" and asked, "[w]hat's this?" Emmanuel Evans said that Antonio answered, "[i]t's a scale." After that, the officers asked Antonio if he would sign a consent form "because if you don't sign the paper, we have got to get a search warrant."
 {¶ 18} During arguments on the motion to suppress, Evans' counsel requested that the items found during the search be suppressed or, in the alternative, for a separate trial on the drug charges. The trial court denied the motion to suppress, but granted the motion for a separate trial on the drug charges. The remaining charges (relating to the aggravated robbery and kidnapping) were tried before a jury the following day.
 JURY TRIAL {¶ 19} Tameria Allen testified that on April 30, 2005, she was supposed to take her "two little cousins, " T.S. and V.S. to the movies. T.S. was 15 and V.S. was 12 or 13. The two girls had been with Tameria all day while she shopped for a big *Page 8 
screen, plasma TV. Tameria said that the one she was looking at cost around $2,300.
 {¶ 20} Tameria explained that her first cousin, Clifford Allen, called her that day several times to tell her that he had $250 for her that he owed her. She told Clifford that she was shopping for a big screen TV and did not have time to come over. Clifford told her that his friend had a 52-inch TV for sale for $1,700 that she should look at. She told her boyfriend, Tommy, about the $1,700 television, and Tommy had said that he might buy it for her.
 {¶ 21} She said that Clifford called her over ten times that day to come over to get the $250 and to see the TV. She was so busy that she kept forgetting to go, but he kept calling. Finally, he called her and said that he was about to leave, so she "rushed over there."
 {¶ 22} When Tameria arrived at Clifford's house with V.S. and T.S., which was around 7:00 p.m., she said that he was standing in his doorway. She motioned for him to bring her the money, but he told her "no, come in" so that she could see the TV. She explained that she walked into his house and saw a "short guy standing behind the door." She said, "[h]e came from behind the door and hit me in the left side of my face with a gun."
 {¶ 23} Tameria stated that she did not see the gun at first because she fell down immediately. But she later saw that she had been hit with a black gun. She described the person who hit her as being short, having very dark skin, and having a *Page 9 
"skully" on, which she explained was a black cap ("the short man"). She said that the "skully" was on top, but she could still see his "hairline with nappy hair," the back of his hair, and his sideburns.
 {¶ 24} She explained that the short man picked her up by the collar of her coat, took her into the den, sat her on the couch, and pointed a gun at her. She then stated, "[w]hen I was sitting on the couch, I seen Antonio looking through the window. And then, after that, he came into the house, and Clifford told him to get the * * * two little girls in the car * * * and bring them in the house." She admitted that she had never seen Antonio Evans before that day, she did not know anyone by the name of Antonio Evans, and she had never heard of Antonio Evans.
 {¶ 25} Tameria said that Evans went back outside and came back in with V.S. and T.S. She then identified Evans as the man she saw outside the window when she was sitting on the couch. She explained that on the day of the crime, Evans was wearing "dark pants, black boots, and a dark quilted blue jacket." She said that his jacket was the kind she had seen police officers wear. When she saw him through the window, his face was right up against the screen.
 {¶ 26} The short man was still pointing the gun at her head, saying, "[w]here is the money? Where is your boyfriend? I know you have some money." And while he was saying that, he was "just hitting me, slapping me in the face." Tameria said that Evans was looking through the window watching the short man hit her. *Page 10 
 {¶ 27} Tameria explained that when Evans brought the girls in the house, he had his gun pointed at them. Then, all three men had their guns pointed at all three of them. Tameria said the girls were "shooken up, when they came in the room. They was crying, looking very scared, and * * * they was starting to shake."
 {¶ 28} Tameria said that the three men kept asking her for money. She explained that she only had $100 in her purse. The short man picked her purse up, but she said that Clifford walked in, took her purse from him, and took the $100. The men continued to point their guns at them. In fact, they never put their guns away.
 {¶ 29} After V.S. and T.S. were in the house, all three of them were sitting on the couch and had their hands duct taped in front of them. Tameria said the short man taped her hands.
 {¶ 30} Tameria said that Clifford told Evans to pull her car in the garage and search it. Evans then left the room and Tameria said that she heard her car start, and eventually Evans came back.
 {¶ 31} The men continued to ask her where the money was, and she kept telling them that she did not know anything. She said she "was crying, scared and terrified." She explained that Clifford told Evans and the short man to take her in the other room and search her. The two men did, and they had their guns pointed at her at all times. They took the tape off her hands and ordered her to strip down to her underwear and bra. She said they searched her "breasts and [her] crotch, * * * [f]eeling over my chest and my vagina area." She stated, "[Evans] proceeded to hit *Page 11 
me in my face, and the other guy hit me in my face." Evans slapped her so hard, she had hand prints on her face. Evans also put "his hand around [her] neck and choked [her]." The short man also "punched [her] in the face." She got dressed, went back into the other room, and they taped her hands again.
 {¶ 32} After that, Tameria said that Evans and Clifford went into the other room and were whispering. They came back and said that everyone was going to get into the car to look for Tameria's boyfriend. Tameria explained that Clifford drove her car, while T.S. sat in the front beside Clifford, V.S. sat behind Clifford, Tameria sat in the middle, and the short man sat beside Tameria, behind the front passenger seat. Tameria said that the short man continued to hold a gun pointed at her and V.S. in the back seat. Tameria explained that Evans "walked down the street and he came back in a red car."
 {¶ 33} Before they left, Clifford said that he knew that Tameria's boyfriend "hangs on St. Clair," but he did not know how to get there. Evans pulled up in his car and told Clifford, "Follow me, I know how to get there." On the way, they stopped at a Shell gas station. Clifford paid for the gas, while Evans pumped the gas. The short man stayed in the car with the three victims. All three victims were crying and T.S. "was actually saying she can't breathe." T.S. was crying very hard and taking deep breaths. Tameria said she asked her if she was okay, and T.S. replied, "I can't breathe. I can't breathe." *Page 12 
 {¶ 34} When they left the gas station, they stopped on a "very dark street" so that V.S. could "use the bathroom" behind a tree. The short man took her behind the tree.
 {¶ 35} When they got back into the car, they asked Tameria to call her boyfriend, which she did. Her boyfriend said, "I'm busy, I'll call you back." When he called back, she could not answer her phone because "they had my phone and purse and everything." At this point, when her boyfriend called back, it was "[a]round 11 or 12 at night."
 {¶ 36} After that, they just drove around. Clifford and the short man kept asking each other what they should do. They stopped at one point and the short man got out of the car and went to talk to Evans. Tameria said that she started talking to Clifford then to try to convince him that she would "work with him" to get him the money, which made him trust her. She testified that at that point, Clifford said, "we going to have to let you go because we can't do nothing, unlucky, and he was like, don't say anything, but he, Antonio, is a police officer. He didn't say his name. He said the guy with the jacket is a police officer. And he live in Maple. That's the one he always gamble with." Clifford also said the short man "had just got out of jail from doing twelve years."
 {¶ 37} Tameria testified that when the short man went to talk to Evans, she wrote down the license plate of the red car Evans was driving. She wrote it on the *Page 13 
back of her seat cover with a pen. She identified the seat cover, and it was admitted into evidence. She read the number from the seat cover as "CX61RE."
 {¶ 38} Finally, the men dropped them off at T.S.'s and V.S.'s house. They did not call the police until a few days to a week later. She explained that because Evans was a police officer, she was afraid to go to the police. Clifford had also been leaving her threatening phone calls. She gave a statement to the police and then sought medical treatment. She had a swollen ear drum.
 {¶ 39} Tameria testified that she was able to identify Clifford from a photo lineup. Later, she said that the detectives called her back to the police station and she was able to identify Evans from a second photo line-up. She then identified the photo line-up (with Evans' picture) in court as the one she saw that day at the police station.
 {¶ 40} Tameria also identified a "gun holster" that she said looked like the holster that she had seen on the right side of Evans' waist that day.
 {¶ 41} She explained to the court that she rode with Detective Russell past a house in Maple Heights, and she identified a red car that matched the description of the one Evans was driving that night, as well as most of the numbers that she had written down from the license plate.
 {¶ 42} T.S. testified next. She substantially corroborated Tameria's testimony regarding the events that occurred on the night in question (that personally involved her), except for the following differences. T.S. stated that when she, Tameria, and *Page 14 
V.S. arrived at Clifford's house, Tameria went inside the house while they waited outside.
 {¶ 43} T.S. explained the next thing that happened as, "[a]nd the ex-cop came outside and told us that she said turn the car off and come in the house, and-[.]" The prosecutor interrupted her questioning at that point and asked, "Okay. Why do you say ex-cop?" She replied, "Because that is what he is. That's what Clifford told us he was, an ex-cop." She could not remember what he looked like, but did remember that he was wearing black and was carrying a gun on his side.
 {¶ 44} T.S. also explained that she never talked to the police until the day before trial. She said that her mother had not wanted her to talk to the police prior to that. On cross-examination, she agreed that she was not able to identify anyone in a photo line-up.
 {¶ 45} Detective Russell testified that he was lead investigator in this case. He explained that he first received a report on this matter on May 2, 2005. He explained that Tameria came into the police station and filled out a written statement. She told him that one of the men was her cousin, Clifford Allen, and that one of the other men was "possibly an ex-police officer, and possibly lived in Maple Heights." She also indicated that the ex-police officer may have worked for the city of East Cleveland. Even though Clifford Allen was her cousin, he had Tameria identify him in a photo line-up. *Page 15 
 {¶ 46} Detective Russell observed physical injuries on Tameria's face. He saw that "[o]n the side of her face, she had some swelling, and a small knot on her, like on her jaw area." She told Detective Russell that she was still in pain, but had not sought medical treatment. He said that he told her that she needed to go to the hospital to make sure that there was nothing wrong with her. She told him that she had not been to see a doctor because she was afraid.
 {¶ 47} Clifford Allen was then arrested and taken to the "central jail, downtown." Detective Russell went to talk to Clifford Allen. Clifford Allen gave him an oral statement, basically claiming that he had no knowledge of what happened that day and that maybe his cousin lied about the incident because of a feud in their family. He was not able to talk to Clifford Allen after that because he made bail and did not show up for his court hearing, so a capias was issued.
 {¶ 48} Because an ex-police officer was possibly involved in the case, Detective Russell went to his supervisor, Lieutenant Connelly, about the matter. Lieutenant Connelly immediately contacted the Internal Affairs Department of the East Cleveland Police Department, who faxed over a list of their auxiliary police officers. The fax was admitted into evidence. It listed 32 officers, and only one name on the list showed an officer who lived in Maple Heights; i.e., Antonio Evans.
 {¶ 49} Detective Russell said that Tameria had shown him her seat cover where she had written down the license plate number of the red car. He read the numbers and letters of the license plate number: "CX61RE." He stated that he had *Page 16 
run the plates, as well as several combinations of the numbers, and had not found a match. He explained that the seat cover was elastic and he believed that Tameria had tried to write the number with a pen, so one of the letters or numbers could have been unreadable.
 {¶ 50} Detective Russell explained that he drove past Evans' house in Maple Heights. He saw a red vehicle parked in front of the house with a license plate of CX61BZ. The first four digits matched the license plate number given to him by Tameria.
 {¶ 51} Lieutenant Connelly instructed him to take Tameria by the house to see if she could identify the vehicle. He drove by the red car twice with Tameria, in an unmarked police vehicle, and she identified it as being the car Evans drove that night.
 {¶ 52} Detective Russell took Tameria back to the police station, and she made a second statement identifying the vehicle. He then showed her a photo lineup, which included Evans, and she identified him.
 {¶ 53} After that, they obtained an arrest warrant for Evans. They went to his house and arrested him. Evans gave the police a written statement, which was admitted into evidence.
 {¶ 54} Detective Russell testified that Evans' version of the events were: "[he] had gambled with Clifford Allen earlier in the day, and had lost around $500 to Clifford. He went back later in the evening, to play cards again. He said, as he was *Page 17 
walking up the driveway, he looked in the picture window and saw what he described as a pretty girl. He said, that he then saw Clifford and the pretty girl and some kids coming out the side door.
 {¶ 55} "Clifford came up to him, asked him to take them to Wade Park * * * [a]nd Antonio agreed. [T]here was some conversation as to letting someone ride in Antonio's car with him. Antonio stated that he didn't know those people. He didn't want them in his car.
 {¶ 56} "So, they got, both of them got in their cars, with all the people in one car, Antonio in the vehicle by himself. They drove throughout the city, going to Wade Park. They stopped a few times, and argued about the money owed to him, the $500 owed to Clifford Allen. And eventually, they just broke off. Antonio left, is what he put in the statement."
 {¶ 57} Detective Russell said that Evans only knew Clifford Allen as "Red," but that Evans had identified him in a photo line-up. Evans also told Detective Russell that he had been armed that day and had been wearing his gun in his holster on his side, he had been wearing his police jacket, they had stopped at a gas station, and the "little girl had to go to the bathroom."
 {¶ 58} Detective Russell explained that he called V.S. and T.S.'s mother as soon as his investigation began, but the mother refused to take them to the police station to make a statement. The day before the trial began, Detective Russell was *Page 18 
able to talk to T.S. and V.S. because of the girls' father, but V.S. did not really say much.
 {¶ 59} Lieutenant Connelly testified after Detective Russell and corroborated Detective Russell's testimony regarding the investigation.
 {¶ 60} The state then rested, and Evans moved for a Crim.R. 29 acquittal, which the trial court denied.
 {¶ 61} Evans presented five witnesses on his behalf, Brian Gerhardt, Terry Wheeler, Herman Waters, Johnny Dean Lawrence, and himself.
 {¶ 62} Gerhardt testified that he was an East Cleveland police officer. He had worked with Evans and always thought he was truthful and honest. He was not friends with him outside of work.
 {¶ 63} Wheeler, an East Cleveland police sergeant, also testified that he had worked with Evans and believed him to be a truthful and honest person. He stated that he and Evans "talk about a lot." He was aware that Evans was having financial difficulties, but did not know of his gambling problem.
 {¶ 64} Waters, a truck driver, testified that he had been friends with Evans for about nine years. He testified that on April 30, 2005, he had talked to Evans several times because Evans had called him to come and play cards with him at "Red's" house.
 {¶ 65} Lawrence, a juvenile corrections officer, testified that he had been friends with Evans since 1994. He said that Evans was honest, respectful, had a *Page 19 
good character, and came to work on time. He also said that Evans called him on April 30, 2005 and asked him to go play cards "with this guy named Red."
 {¶ 66} Evans testified that before he became a police officer for the city of East Cleveland, he had been a juvenile corrections officer, a CMHA housing police officer for about two-and-a-half years, and an undercover narcotics officer for the Ashtabula Sheriff Department for about a year. He worked at East Cleveland for four years before he was laid off.
 {¶ 67} On April 30, 2005, Evans stated that he had gone over to Red's house to play cards early in the day and had lost $500 to him. He explained that "Red" was Clifford Allen. Red then called him later in the day and asked him to come back over and play cards again. Evans called Waters and Lawrence to see if they wanted to play cards with him.
 {¶ 68} Evans testified that he went to Red's house and parked two houses down. He walked up and saw a female in the window. He said he waved at her, but she did not wave back. He went in the house and Red said to him, "my people are over. You can follow me." Evans said that he went back to his car and he saw another male, the female, and "two kids" come out of the house. Red asked him if some of them could ride with him, and he told him no because he did not know them. He said he followed Red.
 {¶ 69} While Evans was following Red, he said that he called Waters and Lawrence back to see if they wanted to play cards. At some point, Evans took the *Page 20 
lead because Red did not know where he was going. They went to a gas station on "55 and St. Clair" because Red needed gas. Evans said he talked to Red while he was pumping his gas. Red told him, "I just need to get to Wade Park." Evans told him how to get there. Red then said, "my little cousin got to use the bathroom," so after they left the gas station, they stopped down a side street for the girl "to go behind a tree."
 {¶ 70} After that, they drove to the Wade Park area and drove around. Evans said that Red could not find the place he was looking for, so they were just going to "hook up later." Before he left, Evans said that he got into an argument with Red about the money he owed Red. During this argument, Red said, "Okay Evans, East Cleveland Police." Evans said that he took that as a threat because he had never told Red that he was a police officer. Evans said he went home after that and was home by 10:00 p.m. Red only called him one other time for his money. After that, he never heard from him again.
 {¶ 71} Evans said that he was wearing his firearm "concealed" in his holster on that day because he "usually" wore it. He explained that he was permitted to wear his firearm at all times as a police officer, for his own protection, as well as for the protection of his fellow citizens.
 {¶ 72} Evans rested and moved for a Crim.R. 29 acquittal again, which the trial court also denied. *Page 21 
 VERDICT AND SENTENCING {¶ 73} The jury found Evans guilty of one count of aggravated robbery (theft offense against Tameria Allen with a deadly weapon), and three counts of kidnapping (to facilitate the commission of a felony) under R.C. 2905.01(A)(2), all with the one-and three-year firearm specifications. The jury found Evans not guilty of two counts of aggravated robbery (against T.S. and V.S.) and not guilty of three counts of kidnapping (to terrorize or inflict serious physical harm) under R.C. 2905.01(A)(3).
 {¶ 74} Prior to sentencing, Evans withdrew his former not guilty plea and entered a plea of no contest to possession of drugs and possessing criminal tools.
 {¶ 75} The trial court sentenced Evans to the minimum of three years in prison for the aggravated robbery and three years in prison on each of the three counts of kidnapping, and further ordered that the sentences be served concurrently. The trial court merged the firearm specifications into one three-year prison term for purposes of sentencing, and ordered that it be served prior to and consecutive to the underlying felonies. The trial court also sentenced Evans to six months in prison on each of the drug convictions, and ordered that they be served concurrent to the other counts, for a total of six years in prison. And the trial court informed Evans that he would be subjected to mandatory post-release control upon his release from prison.
 ISSUES ON APPEAL *Page 22 {¶ 76} It is from this judgment that Evans appeals, raising three assignments of error for our review:
 {¶ 77} "[1.] The court erred in denying defendant's motion for judgment of acquittal as to alleged victim [V.S.] Her failure to testify precluded any rational factfinder finding all of the material elements of the offense charged.
 {¶ 78} "[2.] The court erred in denying defendant's motion for judgment of acquittal as to alleged victim [V.S.] Her failure to testify precluded any rational factfinder finding all of the material elements of the offense charged.
 {¶ 79} "[3.] The trial court erred in denying defendant's motion to suppress evidence obtained as a result of the warrantless search of his home without proper consent."
 "TERRORIZING" EVIDENCE {¶ 80} In his first assignments of error, Evans argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal as to kidnapping of the victim, V.S. He claims that because V.S. did not testify, there is no evidence that she was "terrorized" under R.C.2905.01(A)(3).
 {¶ 81} The test an appellate court must apply in reviewing a challenge based on a denial of a Crim.R. 29 motion for acquittal is the same as a challenge based on sufficiency of the evidence to support a conviction. See State v. Bell (May 26, 1994), 8th Dist. No. 65356, 1994 Ohio App. LEXIS 2291. *Page 23 
 {¶ 82} An appellate court's function in reviewing the sufficiency of the evidence is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v.Thompkins (1997), 78 Ohio St.3d 380, 386. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jenks at 273.
 {¶ 83} Under R.C. 2905.01(A), "[n]o person, by force, threat, or deception, * * * by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 84} "* * *
 {¶ 85} "(2) To facilitate the commission of any felony or flight thereafter;
 {¶ 86} "(3) To terrorize, or to inflict serious physical harm on the victim or another[.]"'
 {¶ 87} Evans' argument has no merit because the jury did not find Evans guilty of kidnapping by terrorizing or inflicting serious physical harm under R.C. 2905.01(A)(3); it only found him guilty of kidnapping with respect to facilitating the *Page 24 
commission of a felony pursuant to R.C. 2905.01(A)(2), of which there was ample evidence presented to support this conviction.
 PHOTO LINE-UP/IN-COURT IDENTIFICATION {¶ 88} Although Evans's first assignment of error is limited to the "alleged victim" V.S., he raises an issue regarding T.S. within his argument. He claims that his kidnapping conviction with respect to T.S. cannot be sustained because T.S. never identified him in a photo line-up or in court and therefore, the trial court should have granted his Crim.R. 29 motion. We disagree.
 {¶ 89} Although T.S. did not identify Evans in a photo line-up or in court, the evidence submitted at trial was overwhelmingly sufficient for any reasonable trier of fact to find Evans guilty of kidnapping T.S. beyond a reasonable doubt. Tameria unequivocally identified Evans in a photo line-up and in court as one of the three men who held her and her two cousins against their will for almost five hours on the night of April 30, 2005.
 {¶ 90} Tameria testified that she saw Evans looking at her through the window in Clifford Allen's house (a fact Evans admits); that he brought her cousins into the house; that he and the short man held all three of them at gun point; and that he actively took part in the course of events that night (many that Evans admits, including going to the gas station, stopping so V.S. could "go behind a tree," driving around for hours, and having several conversations throughout with Clifford and the short man). Tameria also identified Evans' car as the "red" one that she had written *Page 25 
down the license plate number on the back of her seat cover. Although all of the numbers and letters on the seat cover were not readable, the first four digits matched exactly.
 {¶ 91} T.S. also corroborated Tameria's testimony, including the fact that Clifford Allen had told them that Evans was an "ex-cop." T.S. also described the dark clothes Evans was wearing that night, explained that he wore his gun holster on his side (also a fact Evans admits), and described his gun.
 {¶ 92} In fact, there is no question in this case that Evans was present that night. Not only did Tameria identify him as one of the three men who held them at gun point, but Evans admitted that he was one of the three men present that night. Just because T.S. could not identify him in a photo line-up or in court — seven months after the crime occurred — does not make his identity a serious issue in this case.
 {¶ 93} Therefore, viewing the evidence in a light most favorable to the state, the evidence was sufficient such that any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Evans' first assignment of error is overruled.
 VICTIM DID NOT TESTIFY {¶ 94} In his second assignment of error, worded exactly as his first, Evans maintains that because V.S. did not testify, there was no evidence that he restrained her liberty. Evans does not cite to any authority, however, to support his contention *Page 26 
that the victim must testify in a criminal case for a conviction to stand. Accordingly, we find no merit in his argument.
 {¶ 95} Tameria and T.S. testified as to their personal knowledge regarding the events that transpired, including V.S. being a victim, on the night in question. The state was not prevented from presenting this evidence simply because V.S. did not testify. The state did not elicit inadmissable "hearsay" testimony regarding what V.S. said that evening. Tameria and T.S. gave nonhearsay, eyewitness accounts of their observations.
 {¶ 96} It is patently clear that the evidence presented at trial showed that V.S. was a victim of kidnapping in this case. Accordingly, Evans' second assignment of error is overruled.
 FOURTH AMENDMENT ISSUES {¶ 97} In his third assignment of error, Evans raises two issues for our review. He maintains that there were "no specific and articulable facts" that gave rise to the officers' protective sweep of his home and that the officers coerced him to sign the "consent to search form." Although we agree that the protective sweep was not warranted, his consent to the search was freely and voluntarily given.
 {¶ 98} Appellate review of a suppression ruling involves mixed questions of law and fact. See State v. Burnside, 100 Ohio St.3d 152,2003-Ohio-5372. When ruling on a motion to suppress, the trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight of the evidence. See State v. *Page 27 Fanning (1982), 1 Ohio St.3d 19, 20. An appellate court must accept the trial court's findings of fact as true if they are supported by competent and credible evidence. Burnside, supra, at _8. But the appellate court must then determine, without any deference to the trial court, whether the facts satisfy the applicable legal standard. Id.
 {¶ 99} "The Fourth Amendment to the United States Constitution provides in part: `the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *.' The Fourth Amendment to the United States Constitution and Section 14, Article One, of the Ohio Constitution require the police to obtain a warrant based upon probable cause before they conduct a search." State v. Rankin, 8th Dist. No. 88866, 2007-Ohio-4844, at _20, citing Coolidge v. New Hampshire (1971),403 U.S. 443.
 {¶ 100} "The heart of the Fourth Amendment is its reasonableness test, and the mechanism the Fourth Amendment establishes to insure that the reasonableness test is satisfied is the companion requirement of a prior judicial warrant. Thus, `searches conducted outside the judicial process, without prior approval of a judge or magistrate, are per se unreasonable.' Katz v. United States (1967), 389 U.S. 347, 357.
 {¶ 101} "Warrantless searches are not per se illegal, however, and will be upheld when, under the facts and circumstances of the particular case, it was *Page 28 
reasonable for law enforcement officers to forego securing a warrant prior to conducting a search or seizure. Reasonableness is demonstrated when the `societal costs of obtaining a warrant, such as the danger to law enforcement officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate.'Arkansas v. Sanders (1979), 442 U.S. 753, 759.
 {¶ 102} "In order to create an exception to the warrant requirement, the costs involved in obtaining a warrant must be sufficiently significant to justify avoiding the delay inherent in procuring a warrant. The normal inconvenience and slight delay involved in procuring a warrant, standing alone, `are not enough to bypass the constitutional requirement.' Johnson v. United States (1948), 333 U.S. 10, 15. And, because the warrant requirement functions to set limits on police discretion, warrantless searches are unconstitutional absent a recognized exception, `notwithstanding facts unquestionably showing probable cause sufficient to obtain a warrant.' Agnello v.United States (1925), 269 U.S. 20, 33." (Parallel citations omitted.) State v.Sharpe, 174 Ohio App.3d 498, 2008-Ohio-267, at _27-29.
 PROTECTIVE SWEEP {¶ 103} In Maryland v. Buie (1990), 494 U.S. 325, the United States Supreme Court set forth the standard for a warrantless "protective sweep" of a residence in connection with the arrest of a person found at the residence.
 {¶ 104} The Supreme Court reasoned: *Page 29 
 {¶ 105} "In Terry and Long we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them. In the instant case, there is an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A Terry or Long frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's `turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Id. at 333.
 {¶ 106} A protective sweep, however, is not a full search of the premises.
It is only a cursory inspection of those areas where a person who possesses a threat of danger to police may be found. The Supreme Court held:
 {¶ 107} "[A]s incident to the arrest, the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other *Page 30 
spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those arrested on the scene." Id. at 334.
 {¶ 108} "By adopting the `reasonable and articulable suspicion' standard of Terry and Long, the Supreme Court in Buie imposed a circumstantial predicate on the authority conferred on law enforcement officers to conduct a protective sweep of a defendant's residence following his arrest. There must be articulable facts from which police reasonably suspect that the premises in which defendant is arrested harbors another person or persons who may launch an attack on the officers who are there. Absent that basis to act, a protective sweep is an unreasonable search for purposes of the Fourth Amendment, and any incriminating evidence it produces must be suppressed." Sharpe, supra, at _37, citing Buie.
 {¶ 109} It is important to note that "Ohio case law, followingBuie and its
progeny, burdens the state with having to prove by a preponderance of the evidence that law enforcement possessed specific and articulable facts that the area to be swept harbored an individual who posed a danger to the arrest scene." State v. Mickey, 8th Dist. No. 82844,2003-Ohio-6878, at ¶ 18, citing Buie. *Page 31 
 {¶ 110} Thus, in the case sub judice, this court must determine whether the state met its burden and proved that the officers had "specific and articulable facts," which warranted the protective sweep.
 {¶ 111} In Mickey, this court affirmed the trial court's granting of the defendant's motion to suppress. The officers had gone to the defendant's home to serve an arrest warrant. They knocked on her door several times with no response. A detective testified that he saw the defendant heading for the garage. They repositioned themselves and arrested her as she entered the garage. The detective testified that they "entered the home to perform a routine protective sweep and secure the home," but "[a]t no time did the officers feel threatened by [the defendant], nor did they have any facts that would lead them to believe the home harbored an individual who posed a danger to the arrest area." Id. at _3.
 {¶ 112} We explained in Mickey that, "[a]t the suppression hearing, the only appellant witness to testify, [Detective] Cleland, failed to provide persuasive evidence that law enforcement possessed any information that the area to be swept harbored an individual who posed a threat to the arrest scene. At one point [Detective] Cleland said: `There was a cursory sweep of the house to see if there was anybody else.' * * * The Court later asked him, `was there really any concern for officer's safety?' Cleland responded, `Well as I said, we have no knowledge of the other son as to whether or not he was there or not or if any other parties were living *Page 32 
with her.'" Id. We held that under those facts, law enforcement exceeded its authority to conduct a search of the home incident to the arrest. Id. at _19.
 {¶ 113} In State v. Martin, 8th Dist. No. 82026, 2003-Ohio-4058, this court
upheld a trial court's granting of a motion to suppress because we agreed that the protective sweep was not warranted. One officer testified in Martin that he and two other deputies executed a felony arrest of Martin. They did not know whether "[Martin] lived at this house, whether anyone else lived there, or if she was considered dangerous." Id. at ¶ 2. When they arrived, they saw Martin look out the window and then run away. They knocked, announced, and entered the home. They heard "rumbling" upstairs, and Martin eventually came down, and they arrested her. One of the officers then went upstairs "to determine whether there were any other people in the house." Id. at ¶ 4. While conducting the protective sweep, the officer saw drugs in plain view.
 {¶ 114} At the suppression hearing, the officer "admitted that there was nothing to suggest any threat of danger when he searched the upstairs bedroom. He explained that he searched the room as a matter of routine practice and not because there was any indication of potential danger." Id. at ¶ 14. We held, "[w]ithout specific articulated facts which would warrant a reasonably prudent police officer to believe that the upstairs harbored an individual who posed a threat of danger to the police, the search of the upstairs bedroom was unlawful." Id. *Page 33 
 {¶ 115} In State v. Rankin, 8th Dist. No. 88866, 2007-Ohio-4844, this court affirmed the trial court's denial of the defendant's motion to suppress. The officers "conducted the protective sweep of the closet because they feared there might be other people who posed a danger in that closet." Id. at ¶ 23. We stated, "[t]he protective sweep was warranted because the nature of the alleged crime (aggravated robbery) gave the police a strong reason to believe that the situation posed a risk of serious harm to the officers." Id. The aggravated robbery had presumably occurred close in time to the arrest because the officers said they saw "[c]lothes that matched the descriptions given by the victims were lying on the bedroom floor." Id. at ¶ 10.
 {¶ 116} In Sharpe, supra, the Second Appellate District reversed a trial court's denial of a defendant's motion to suppress. The evidence at the suppression hearing showed that the police were aware that the defendant had a firearm. After they arrested him, they conducted a protective sweep of the home and saw drugs in plain view. They obtained a search warrant on what they saw during the protective sweep. The trial court denied the suppression motion because it found that "[d]ue primarily to the firearm * * * the situation remained perilous." Id. at ¶ 43.
 {¶ 117} The Second District court disagreed. It reasoned: "The protective sweep exception to the warrant requirement in Buie * * * requires some positive indication that another person or persons remain in the residential premises where a *Page 34 
subject is arrested, and that they pose a threat to the safety of the officers or others. Lacking that indication, there is not a need to act which is sufficient to avoid the requirement of a prior warrant if the house is to be searched after a defendant's arrest there. Mere suspicion that a weapon remains inside is insufficient. Likewise, not knowing whether anyone else is there is an insufficient pretext, because the need for protection necessarily implies that another person or persons are there. Faced with such doubts, and absent any reason to believe that other persons may be inside, officers must obtain a warrant before they conduct a search of a defendant's house after a defendant's arrest there." Id. at ¶ 46.
 {¶ 118} In this case, the state, relying on Mickey, supra, contends that Evans' argument that the protective sweep was unconstitutional "rings hollow considering the fact that the arresting officers knew that they were entering a residence where at least one firearm was stored, clearly a specific and articulable fact `that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" We disagree. The fact that there was a firearm on the premises says nothing about the possibility of another individual being on the scene who could use that firearm to threaten the officer's safety.
 {¶ 119} The state also argues that the officers on the scene "were all aware that Appellant was a fully trained and armed auxiliary East Cleveland police officer at that time[.]" Yes, the officers knew that Evans was an armed auxiliary *Page 35 
police officer; yet he was immediately arrested and handcuffed when the officers entered his home.
 {¶ 120} The officers testified that they "cleared the house" to make sure that no one was there who could cause them harm. But they did not testify as to any specific and articulable facts which would have led them to believe that someone else was hiding in the house. Detective Russell testified that he saw what he believed to be Evans' car parked at the house. He did not indicate that there were other cars there. The crime had taken place weeks before the arrest. Evans and his two brothers immediately cooperated with the officers; they did not run or try to hide from the officers. Nor did the officers testify that they heard anyone else in the house or give any reasons as to why they believed someone might be hiding in the home.
 {¶ 121} After reviewing the evidence, we conclude there were no specific, articulable facts presented that would indicate that someone else was hiding in the house who would pose a danger to the officers. As this court has previously held, a "routine protective sweep" is not enough to justify a warrantless search. See Mickey, supra, andMartin, supra. As such, the protective sweep here — which appears to have been merely routine — was not warranted. Evans' first issue under his third assignment has merit.
 CONSENT TO SEARCH *Page 36 {¶ 122} Nevertheless, if Evans voluntarily consented to the search of his home, then the discovery of the drug-related items did not violate his constitutional rights. Evans maintains his consent was coerced. We disagree.
 {¶ 123} The question of whether consent to a search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances.Schneckloth v. Bustamonte (1973), 412 U.S. 218, 227. The standard for measuring the scope of consent under the Fourth Amendment is objective reasonableness; i.e., what a typical reasonable person would have understood by the exchange between the officer and the suspect.Florida v. Jimeno (1991), 500 U.S. 248, 251.
 {¶ 124} "Important factors in determining whether a consent was voluntary are: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." State v. Washington, 8th Dist. No. 86370, 2006-Ohio-568, at _20.
 {¶ 125} After reviewing the totality of the circumstances, we conclude there was competent, credible evidence presented at the suppression hearing to show that Evans freely and voluntarily consented to the search — in writing — when he signed the "consent to search form." *Page 37 
 {¶ 126} Although Evans was already in police custody when they asked him to consent to a search, Evans readily cooperated and agreed to sign the consent form. Lieutenant Connelly explained, "[w]e advised him. He agreed. It was not like it took us a long time." And as a police officer, Evans cannot reasonably argue that he was vulnerable in any way or did not understand the rights he was giving up. He was fully aware that he could force the officers to obtain a warrant before they searched his home, but he chose not to.
 {¶ 127} Evans' two brothers testified that the officers said to him that if he did not consent to the search, then they would get a warrant (a fact the officers dispute). In some circumstances, a claim of authority to search could amount to coercion. See State v. Pierce
(1998), 125 Ohio App.3d 592, 599-600. Here, however, even if the officers did tell Evans that they would get a search warrant, it would not amount to coercion. As we stated previously, as a police officer, Evans cannot reasonably claim that he was led to believe, by the officers' alleged threat to obtain a warrant, that his refusing consent would be fruitless. Thus, Evans' argument that his consent was not voluntary is without merit.
 {¶ 128} Accordingly, Evans' third assignment of error, that the trial court erred when it denied his motion to suppress, is overruled.
 {¶ 129} Having concluded that Evans' three assignments of error lack merit, the judgment of the Cuyahoga County Court of Common Pleas is affirmed.
 It is ordered that appellee recover from appellant costs herein taxed. *Page 38 
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY JANE BOYLE, JUDGE.
FRANK D. CELEBREZZE, JR., J., CONCURS; ANN DYKE, P.J., CONCURS IN JUDGMENT ONLY. *Page 1