**[Cite as *State v. Wolfe*, 2025-Ohio-866.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29759 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 04039 |
| | : | |
| JASON WOLFE | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 14, 2025

. . . . . . . . . . .

JASON WOLFE, Appellant, Pro Se

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Jason Wolfe appeals pro se from his convictions, following a jury trial, for kidnapping (with a repeat violent offender specification that was tried to the court), grand theft, and petty theft. For the reasons that follow, the trial court's judgment will be reversed as to sentencing and remanded for the trial court to give all the advisements

required by the Reagan Tokes Act, to properly impose the Tier 1 sex offender/child victim offender designation, and to properly consider restitution. In all other respects, the judgment of the trial court will be affirmed.

## Procedural History

{¶ 2} The events that gave rise to the charges against Wolfe occurred on November 15, 2021, when Wolfe stole the vehicle of S.C., with her 11-year-old son, D.C., inside. At the time, the vehicle was parked at a DashMart on Watervliet Avenue, and S.C., who worked for DoorDash, had gone inside to pick up an order to deliver. While S.C. was inside, Wolfe drove away in her vehicle. Wolfe eventually ordered D.C. out of the vehicle near Carmel's Restaurant on Shroyer Road, and D.C. was later reunited with his mother.

{¶ 3} The lengthy procedural history of this case began when Wolfe was indicted on the three counts -- kidnapping, grand theft, and petty theft -- on February 15, 2022. The court entered a plea of not guilty on Wolfe's behalf.

{¶ 4} After Wolfe had been represented by multiple defense attorneys, he elected to proceed pro se with standby counsel. He was tried in January and February 2023. On February 6, 2023, the court filed an entry memorializing the jury's findings of guilt on all three counts. Wolfe filed multiple post-trial motions, which the court overruled on February 13, 2023. The repeat violent offender specification to the kidnapping offense was tried to the bench on February 14, 2023, and the court found Wolfe guilty on the specification the next day.

{¶ 5} On March 1, 2023, Wolfe filed a notice of appeal of his "conviction by jury

trial" and the trial court's finding on the repeat violent offender specification. However, the sentencing hearing did not occur until March 2, and the court filed its judgment entry of conviction on March 6, 2023. In its judgment entry, the trial court sentenced Wolfe to an indefinite mandatory minimum term of eight years to a maximum term of 12 years for kidnapping, to 18 months for grand theft, to be served concurrently with the kidnapping sentence, and to 180 days of local incarceration for petty theft, to be served concurrently with the first two counts; the aggregate term was eight to 12 years. The court designated Wolfe a repeat violent offender, and it ordered him to pay restitution to S.C. in the amount of $604.69. Wolfe filed a notice of appeal from the March 6 judgment on March 30, 2023.

{¶ 6} On May 4, 2023, following a hearing, the court also designated Wolfe a Tier 1 sex offender/child victim offender. The following day, the court filed an amended termination entry, which added language that Wolfe was a Tier I sex offender/child victim offender.

{¶ 7} Wolfe raises 20 assignments of error on appeal. However, as a preliminary matter, we note that Wolfe's March 1, 2023 notice of appeal was filed prematurely, i.e. before he was sentenced and a final judgment entry was filed. App.R. 4(C) governs premature notices of appeal and states: "A notice of appeal filed after the announcement of a decision . . . but before entry of the judgment or order that begins the running of the appeal time period is treated as filed immediately after the entry." "Clearly the Rules of Appellate Procedure contemplate that there may be an announcement of a decision or order which does not commence the running of the 30-day period for filing a notice of appeal and which is not final until the entry of the judgment based on that decision. If

the notice of appeal is filed prematurely, App.R. 4(B) makes it timely when the judgment entry is filed." *State v. Tripodo*, 50 Ohio St.2d 124 (1997). We will treat Wolfe's premature March 1, 2023 notice of appeal as filed on the date of the March 6, 2023 judgment entry of conviction, which was a final appealable order.

{¶ 8} We also note that Wolfe's brief exceeds the page limit set forth by the appellate rules. (Also, the first 16 pages of the brief are typewritten, and the remaining 26 pages are hand-written.) App.R. 19 governs the form of briefs and states:

> Without prior leave of court, no initial brief of appellant or cross-appellant and no answer brief of appellee or cross-appellee shall contain more than 9,000 words, and no reply brief shall contain more than 4,500 words, exclusive of the cover page, table of contents, table of cases, statutes and other authorities cited, statement regarding oral argument, certificates of counsel, signature blocks, certificate of service, and appendices, if any. An initial brief . . . not exceeding 30 pages in length at 12-point font shall be presumed compliant with the 9,000 word limit.

{¶ 9} Wolfe's brief is 42 pages. We are not required to consider the portion that exceeds the page limit, which consists of approximately five assignments of error. " '[P]ro se litigants are presumed to have knowledge of the law and legal procedures' " and are " 'held to the same standard as litigants who are represented by counsel.' " *State v. Colquitt,* 2023-Ohio-3997, ¶ 14 (2d Dist.), quoting *State ex rel. Fuller v. Mengel*, 2003-Ohio-6448, ¶ 10. Nevertheless, we will address Wolfe's all of Wolfe's assignments of error.

**Repeat Violent Offender Designation**

{¶ 10} Wolfe's first assignment of error states:

THE TRIAL COURT ERRED IN DENYING WOLFE'S MOTION TO HAVE THE JURY DETERMINE WHETHER HE QUALIFIED AS A REPEAT VIOLENT OFFENDER.

{¶ 11} During the trial to the bench on the repeat violent offender specification, Wolfe asserted that the jury should have made a finding with respect to the specification, rather than the court. In support of the repeat violent offender specification, the State introduced a 2002 judgment entry by which Wolfe was convicted of multiple counts of aggravated robbery.

{¶ 12} R.C. 2924.149(B) states: "The court shall determine the issue of whether an offender is a repeat violent offender." Thus, by statute, the trial court determines the repeat-violent-offender specification, not the jury. *State v. Stodgel*, 2024-Ohio-5182, ¶ 43 (4th Dist.), citing *State v. Hunt*, 2013-Ohio-5326, ¶ 76 (10th Dist.) (defendant may waive a jury on a weapon under disability charge but, by statute, the repeat violent offender specification is to be determined by the court rather than the jury). Further:

This is a constitutionally appropriate finding for a judge (rather than a jury) to make, because the evidence supporting the repeat-violent-offender specification is information about the defendant's criminal history and, as the Ohio Supreme Court has explained, "[w]hen designating an offender as a 'repeat violent offender' . . . , a trial court does not violate the Sixth Amendment by considering relevant information about the offender's prior

conviction that is part of the judicial record." *State v. Hunter*, [2009-Ohio-4147, paragraph two of the syllabus.] Moreover, "the Sixth Amendment does not limit a sentencing court's consideration to the *existence* of a prior conviction. On the contrary, the United States Supreme Court has held that courts may consider the information contained in court documents that are related to the prior conviction." (Emphasis sic.) *Id.* at ¶ 36, citing *Shepard v. United States*, [544 U.S. 13, 19-20, (2005)].

*State v. Oller*, 2017-Ohio-814, ¶ 37 (10th Dist.).

{¶ 13} The trial court did not err in denying Wolfe's motion to have the jury determine his status as a repeat violent offender. The repeat violent offender specification was ancillary to the underlying criminal charge and, by statute, the court was required to make the determination, not the jury. Wolfe's first assignment of error is overruled.

### Tier I Sex Offender/Child Victim Offender Designation

{¶ 14} Wolfe's second assignment of error states:

THE TRIAL COURT ERRED AS A MATTER OF LAW AND LACKED JURISDICTION WHEN IT HELD THAT WOLFE WAS REQUIRED TO REGISTER AS A TIER I SEX OFFENDER.

{¶ 15} According to Wolfe, there "was no sexual motive involved in the alleged kidnapping," and because "the trial court sua sponte imposed the requirement after sentencing" and after he had filed his notice of appeal, the trial court lacked jurisdiction to make the sex offender designation. The State responds the trial court was required to

designate Wolfe a Tier I sex offender/child victim offender based upon his kidnapping conviction, as the victim, D.C., was a minor.

{¶ 16} Wolfe was convicted of kidnapping in violation of R.C. 2905.01(A)(2). "Child-victim oriented offense" is defined as any of a number of offenses, including kidnapping under R.C. 2905.01(A)(2), committed by a person, regardless of the person's age, when the victim is under 18 years of age and is not a child of the person who commits the violation. R.C. 2950.01(C). R.C. 2950.01(D) defines a child victim offender as "a person who is convicted of . . . any child-victim oriented offense." Having been convicted of kidnapping in violation of R.C. 2905.01(A)(2), Wolfe was a child-victim offender.

{¶ 17} R.C. 2950.01(E)(2) states: "Tier I sex offender/child-victim offender" means any of the following: . . . "(2) A child-victim offender who is convicted of . . . a child-victim oriented offense and who is not within either category of child-victim offender described in division (F)(2) or (G)(2) of this section." Divisions (F)(2) and (G)(2) apply to offenders previously convicted of a sexually oriented offense. R.C. 2950.03(A)(2) requires a trial court to notify offenders convicted of a child-victim oriented offense of their registration duties, to provide an explanation of those duties, and to certify that the offender was advised of those duties.

{¶ 18} Wolfe's Tier I sex offender/child-victim offender designation attached by operation of law. However, the trial court did not advise him of this fact prior to sentencing, as it was required to do. *See, e.g., State v. Sipple*, 2021-Ohio-1319, ¶ 32 (1st Dist.) (all tier classifications under the Adam Walsh Act are part of the sanction and must be included in the judgment entry). Here, the trial court filed its judgment entry on

March 6, 2023; then, in May 2023, after Wolfe had appealed, it held a separate hearing on the Tier 1 designation and filed an "amended termination entry," which added the Tier 1 sex offender/child victim offender registration language. This procedure was improper, as the trial court lacked jurisdiction to amend its judgment entry while an appeal was pending. Thus, Wolfe is correct that the trial court lacked jurisdiction to impose the Tier 1 designation as it did.

{¶ 19} The trial court's May 5, 2023 judgment which purported to add the Tier 1 designation is a nullity. However, as discussed below, this matter will be remanded to the trial court for resentencing on other issues. At that time, the trial court should properly give the Tier 1 sex offender/child victim offender advisements and include that matter in its judgment entry.

{¶ 20} Wolfe's second assignment of error is sustained in part and overruled in part.

**Merger**

{¶ 21} Wolfe's third assignment of error states:

THE TRIAL COURT ERRED WHEN IT FAILED TO MERGE WOLFE'S CONVICTIONS FOR KIDNAPPING AND GRAND THEFT.

{¶ 22} Wolfe did not object to the trial court's failure to merge his kidnapping and grand theft convictions. Failure to object waives all but plain error. *McBride v. Quebe*, 2006-Ohio-5128 (2d Dist.) Plain error exists "if the trial outcome would clearly have been different, absent the alleged error in the trial court proceedings." *State v. Rollins*, 2006-Ohio-5399, ¶ 15 (2d Dist). "[T]o successfully prevail under plain error the substantial

rights of the accused must be so adversely affected that the error undermines the 'fairness of the guilt determining process.' " *State v. Ohl*, 1991 WL 274508, *2 (5th Dist. Nov. 27, 1991), quoting *State v. Gideons*, 52 Ohio App.2d 70, 77 (5th Dist. 1977).

{¶ 23} R.C. 2941.25 governs multiple counts and states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 24} We have noted that offenses may be of dissimilar import or significance when they involve different victims, they are not alike in their resulting harm, or a defendant's conduct places more than one person at risk. *State v. Coleman*, 2021-Ohio-968, ¶ 6 (2d Dist.), citing *State v. Williams*, 2018-Ohio-1647 (2d Dist.). " '[T]he defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal act.' " *State v. Washington*, 2013-Ohio-4982, ¶ 18, quoting *State v. Mughni*, 33 Ohio St.3d 65, 67 (1987). An appellate court applies a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination. *State v. Williams*, 2012-Ohio-5699, ¶ 28.

{¶ 25} The kidnapping statute, R.C. 2905.01, states: "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: . . . (2) To facilitate the commission of any felony or flight thereafter." R.C. 2913.02 proscribes theft and states: "(A) No person, with purpose to deprive the owner of property . . . , shall knowingly obtain or exert control over . . . the property . . . in any of the following ways: (1) Without the consent of the owner or person authorized to give consent[.]"

{¶ 26} As the State points out, Wolfe's offenses involved separate victims, S.C. and D.C. Moreover, stealing a car and kidnapping a child are not alike in their resulting harms, namely S.C.'s loss of her means of transportation, and D.C.'s removal from his mother's care. We further observe that Wolfe likely put more than one person at risk, either directly through physical injury during the theft of the vehicle or indirectly through the dangerous situations that stolen vehicles can create. For these reasons, we conclude that plain error is not demonstrated in the trial court's failure to merge the offenses. Wolfe's third assignment of error is overruled.

**Advisements under Reagan Tokes Law**

{¶ 27} Wolfe's fourth assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT FAILED TO FULLY ADVISE WOLFE OF HIS RIGHTS UNDER THE RE[A]GAN TOKES LAW.

{¶ 28} The court advised Wolfe as follows at sentencing regarding the kidnapping offense:

Now, as I said, because this is subject to the Reagan Tokes and the indeterminate part of the sentence, I want you to know it is presumed that you will be released from prison at the conclusion of the eight-year prison sentence in this case; however, it's a rebuttable presumption, and the Department of Rehabilitation and Corrections may rebut that presumption if at a hearing held under 2967.271 the Department of Rehabilitation and Corrections makes a specified determination regarding your conduct while confined, your threat to society, whether or not you were in restrictive housing if any while confined, and your security classification. And if the Department of Rehabilitation and Corrections makes those specified determinations, it can rebut that presumption and they may maintain your incarceration after the expiration of the minimum term of eight years or after the presumptive - - well, that doesn't apply to you, but the department may make the specified determinations to maintain your incarnation under these previous provisions, but they cannot keep you any longer than that 12-year prison term that I just discussed.

{¶ 29} The court was required by R.C. 2929.19(B)(2)(c)(iv) to notify Wolfe that for the non-life, felony indeterminate prison term for kidnapping, "the department may make the specified determinations and maintain the offender's incarceration under the provisions described in divisions (B)(2)(c)(i) and (ii) of this section more than one time, subject to the limitation specified in section 2967.271 of the Revised Code; . . . ." The State concedes that the trial court erred at sentencing by failing to properly advise Wolfe pursuant to this

section, and no such advisement was included in the judgment entry.

{¶ 30} "Several of our sister districts have held that a sentence is contrary to law if a trial court sentences an offender to an indefinite prison term under the Reagan Tokes Law and fails [to] advise the offender of *all* the notifications set forth in R.C. 2929.19(B)(2)(c) at the sentencing hearing." (Emphasis added.) *State v. Thompson*, 2021-Ohio-4027, ¶ 29 (2d Dist.), quoting *State v. Massie*, 2021-Ohio-3376, ¶ 18 (2d Dist.). In *Massie*, we remanded the matter to the trial court for the sole purpose of resentencing the defendant in accordance with R.C. 2929.19(B)(2)(c). *Id.* at ¶ 31, citing *Massie* at ¶ 25. The same is required here. Wolfe's fourth assignment of error is sustained, and the matter is remanded to the trial court for the purpose of resentencing consistent with R.C. 2929.19(B)(2)(c) and advising Wolfe of the specific notifications under the Reagan Tokes Act.

### Imposition of Restitution

{¶ 31} Wolfe's fifth assignment of error is as follows:

THE TRIAL COURT PLAINLY ERRED BY NOT ADVISING WOLFE OF HIS OBLIGATION TO PAY RESTITUTION AT SENTENCING.

{¶ 32} Wolfe asserts that the trial court erred in imposing restitution.

{¶ 33} The initial, March 6, 2023 judgment entry of conviction stated: "The Defendant is ordered to make complete restitution to the victim, [S.C.], for economic loss in the amount of $604.69, to be paid through the Montgomery County Clerk of Courts." The State incorrectly asserts that the court did not impose restitution at sentencing or in its judgment entry, thereby rendering this assignment of error moot. The trial court did

impose restitution in its judgment entry, although it did not address the issue at the sentencing hearing.

**{¶ 34}** "R.C. 2929.18 authorizes the trial court to order a defendant to pay restitution to the victim of the defendant's offense in an amount based on the victim's economic loss. If the trial court imposes restitution, at sentencing, the court must determine the amount of restitution to be made by the offender. R.C. 2929.18(A)(1)." *State v. Russell*, 2018-Ohio-2571, ¶ 10 (2d Dist.). A trial court's failure to establish the amount of restitution at the sentencing hearing constitutes plain error requiring a remand. *Id.*, citing *State v. Collins*, 2006-Ohio-3036, ¶ 4 (2d Dist.).

**{¶ 35}** Because the trial court included restitution in the judgment entry but did not address or determine the amount of restitution at sentencing, plain error is demonstrated. We will remand for the court to properly consider the issue of restitution.

**{¶ 36}** Wolfe's fifth assignment of error is sustained.

### Denial of Separate Trials

**{¶ 37}** Wolfe's sixth assignment of error states:

THE TRIAL COURT ERRED WHEN IT OVERRULED WOLFE'S MOTION FOR SEPARATE TRIALS.

**{¶ 38}** Wolfe filed a pretrial motion for separate trials in which he argued that: 1) the kidnapping and grand theft allegations were unrelated to the petty theft allegations; 2) the evidence regarding kidnapping and grand theft would not be admissible at trial on the petty theft charge; and 3) the kidnapping and grand theft occurred at a location distinct from the location of the petty theft. The State opposed the motion, and the trial court

overruled it.

{¶ 39} The trial court determined that Wolfe had failed to meet his burden of affirmatively showing that his rights would be prejudiced if the grand theft and kidnapping charges were not severed from the petty theft charge. It also found that the evidence as to each of the counts was simple and direct. It stated:

> . . . Defendant has not furnished the Court with sufficient information so that it can weigh the considerations favoring joinder against Defendant's right to a fair trial. Defendant's arguments as to the relationship and admissibility of the allegations are conclusory. Defendant's argument as to the location of the alleged offenses is vague. The fact that one offense is alleged to have occurred at a different location than another offense may be relevant to a motion to sever. But Defendant has failed to provide the Court with any information as to why his rights would be prejudiced because Counts One and Two are alleged to have occurred in a different location than Count Three.

{¶ 40} "The law favors joinder to prevent successive trials, to minimize the possibility of incongruous results in successive trials before different juries, to conserve judicial resources, and to diminish the inconvenience to witnesses." *State v. Broadnax*, 2007-Ohio-6584, ¶ 33 (2d Dist.). "Even if offenses are properly joined pursuant to Crim.R. 8(A), a defendant may move to sever the charges pursuant to Crim.R. 14. *Id.* at ¶ 37. Crim.R. 14 requires the trial court to order separate trials "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses[.]"

**{¶ 41}** We note that Wolfe failed to renew his objection to joinder at the conclusion of the evidence. ". . . [I]f a motion for prejudicial misjoinder is not renewed at the close of the state's case or at the conclusion of the evidence, a defendant forfeits his ability to raise the issue on appeal and we review the matter only for plain error." *State v. McComb*, 2017-Ohio-4010, ¶ 51 (2d Dist.), citing *State v. Stargell*, 2016-Ohio-5653, ¶ 12 (2d Dist.). Therefore, we review this assignment of error pursuant to plain error analysis.

**{¶ 42}** "A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial." *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus. "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992), citing *State v. Hamblin*, 37 Ohio St.3d 153, 158-159 (1988). "If the evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Id.*, quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir. 1964).

**{¶ 43}** "[E]vidence is 'simple and direct,' where (1) proof of each offense is

'separate and distinct' or could be 'readily separated'; (2) the jury is unlikely to be confused; and (3) 'the evidence of each crime is uncomplicated.' " (Citations omitted.) *State v. Kocevar,* 2023-Ohio-1513, ¶ 22 (2d Dist.). "Furthermore, the simple and direct test 'focuses on whether the trier of fact is likely to consider "evidence of one [offense] as corroborative of the other . . . ." ' " *Id.* at ¶ 23, quoting *State v. Wiles*, 59 Ohio St.3d 71, 77 (1991), quoting *Dunaway v. United States*, 205 F.2d 23, 27 (D.C. Cir. 1953). "Joinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak, . . . but it is otherwise when the evidence is direct and uncomplicated and can reasonably be separated as to each offense. . . ." *Torres* at 343-344; *see also State v. Clinton*, 2017-Ohio-9423, ¶ 52 (a "jury is capable of segregating the proof of multiple charges when . . . the evidence of each crime is uncomplicated.")

{¶ 44} According to the evidence at trial, Wolfe's offenses occurred close in time and place and in a continuing or ongoing course of conduct. Wolfe went to Angie's Tavern on November 15, 2021, where he repeatedly looked out the front windows for about an hour in the direction of DashMart. Wolfe then went to the side patio at Angie's, which had a view to DashMart. He eventually exited from the side patio without paying his bill at Angie's.

{¶ 45} S.C. had parked her rental vehicle at DashMart while waiting to pick up an order to deliver. D.C. was in the back seat. When the DoorDash order was ready, S.C. went into DashMart, leaving D.C. in the backseat with her car running. Security video showed Wolfe leave Angie's, enter S.C.'s vehicle, and drive away. Moments later, S.C. emerged from DashMart and realized that her car and child were gone.

{¶ 46} Wolfe drove to Carmel's on Shroyer Road, where he ordered D.C. out of the vehicle. Wolfe then drove away, and D.C. went inside and called his mother. With the help of the Dayton Police Department, he was reunited with her. The following day, Xenia Police came into contact with Wolfe and found the keys to S.C.'s car in his backpack. The bartender at Angie's identified Wolfe in a photo spread and testified about the petty theft from the tavern.

{¶ 47} We conclude that plain error is not demonstrated. Even if we assume that evidence of the kidnapping and grand theft would not have been admissible at a trial for only the petty theft, there was no basis to believe that the jury would be unable to distinguish the evidence pertaining to the petty theft offense from the evidence pertaining to the grand theft and kidnapping offenses. Put differently, proof of each offense was distinct and could be readily separated, was uncomplicated, and thus was unlikely to confuse the jury. None of the evidence relating to the petty theft was corroborative of the theft of S.C.'s car with D.C. inside.

{¶ 48} Wolfe's sixth assignment of error is overruled.

### Body and Cruiser Camera Videos

{¶ 49} Wolfe's seventh, fourteenth, and nineteenth assignments of error relate to body and cruiser camera videos. Wolfe argues, respectively, that the State withheld allegedly exculpatory body camera video footage in which D.C. described his attacker as black; that the court failed to admit other allegedly exculpatory body camera video footage for impeachment purposes; and that the admission of a statement by D.C. on a cruiser camera video violated Wolfe's right to confrontation. We will consider these assignments

of error together.

{¶ 50} In his seventh assignment of error, Wolfe argues that the State failed to maintain materially exculpatory evidence, specifically a body camera video in which the child identified an individual of a different race as the car thief close in time to the incident. Wolfe asserts that the video was materially exculpatory in this respect. Although the trial court excluded the testimony about the statement as hearsay, the child's statement could have been considered an excited utterance and thus allowable under Evid.R. 803, regardless of whether the child was available. There was no other contemporaneous evidence from the incident that could substitute for its loss.

{¶ 51} "The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted when the State either fails to preserve materially exculpatory evidence or destroys, in bad faith, potentially useful evidence." *State v. McClain*, 2016-Ohio-838, ¶ 21 (2d Dist.), citing *State v. White*, 2015-Ohio-3512, ¶ 58 (2d Dist.). "Evidence is 'materially exculpatory' if it (1) possesses 'an exculpatory value that was apparent before the evidence was destroyed' and (2) is 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' " *Id.*, citing *California v. Trombetta*, 467 U.S. 479, 489 (1984); *State v. Powell*, 2012-Ohio-2577, ¶ 74.

{¶ 52} "In contrast, evidence is not materially exculpatory if it is merely potentially useful." *State v. Cox*, 2013-Ohio-4941, ¶ 88 (2d Dist.). "Potentially useful" evidence "may or may not have incriminated the defendant. The failure to preserve evidence that by its nature or subject is merely potentially useful violates a defendant's due process

rights only if the police or prosecution acted in bad faith." *Id.* Bad faith "implies something more than bad judgment or negligence." *Powell* at ¶ 81. "It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." (Citations omitted.) *Id.* The defendant bears the burden to prove that the evidence in question was materially exculpatory, not merely potentially useful. *Id.* at ¶ 74.

{¶ 53} The following exchange occurred at the final pretrial conference:

THE COURT: [Prosecutor], have you provided to Mr. Wolfe everything that you have available in this case?

[PROSECUTOR]: Yes, Your Honor. And that has been detailed in a discovery receipt. There are numerous body cam videos that have been turned over, other videos. I mean, phone calls, numerous things have been turned over to him. And it's everything that I have in my possession. And it's detailed on a discovery receipt.

{¶ 54} Wolfe relied on the statement of the bartender at Angie's. When asked whether she knew what was going on at DashMart when she saw law enforcement officers respond there, she stated, "I just remember this lady being hysterical and I walked up and I said, what happened? And she said that her car was stolen. And I said was it a white guy? And at that time the police were telling [sic] that it was a black man that stole the car." The bartender further stated, "I'm telling you I had this feeling about this guy that was just at my bar."

{¶ 55} Wolfe also points to the following exchange during the bartender's cross-

examination:

Q. [BY THE DEFENSE]: But when you walked across the street, you testified that you walked across the street, you did alert the Dayton police at that time that somebody had walked out on a bar tab?

A. It came up in the conversation of, could this be the same guy that stole the car? Yeah, that came up.

. . .

Q. And when that conversation came up, is that at the same time that they informed you that it was a black male they believed had taken the vehicle?

A. They said that, but again, just because I have a [credit] card [of the suspect] doesn't determine if you're white or black. . . . You also, or the person in this video is also wearing all black, so.

{¶ 56} Dayton Police Officer Christopher White responded to Dashmart on the day of the incident and then proceeded to Carmel's, where he located D.C. When White was asked about the existence of any body camera video of his conversation with D.C. about the incident, White stated that his body camera had been "at the docking station, at the district, charging, when the call came out. And due to the nature of the call, I rushed straight to DashMart without my camera. And I do not recall if I picked it back up and put it on my body before going on Carmel's run." Thus, Wolfe's assertion that White testified that he believed he had had his body camera on when he found the child mischaracterizes the evidence.

{¶ 57} Finally, Wolfe points to the cross-examination of Dayton Police Detective

Brandan Veregee, wherein the following exchange occurred:

> Q. Did you ignore evidence that showed material to innocence [sic] in the allegations of this case either through recorded prior statements of the alleged victim or other evidence that indicated innocence?
>
> A. No. . . . I turned over absolutely everything to the Prosecution.

When asked if he had viewed audio or video footage of the child in which the child stated that a black man had been driving the vehicle, Veregee responded, "I do believe the 11 year old who was asleep in the backseat, did make that statement to an officer." On redirect examination, Veregee testified that D.C. "said that he - - the person who got in his car sounded black. That was his words." He further clarified, "But obviously after I watched the video, after everyone watched the video, the person who got in that car was not black."

{¶ 58} The jury heard from both the bartender and Det. Veregee that D.C. had reported that the suspect in his kidnapping sounded black or was black. This testimony undercuts Wolfe's assertion that there was "no other contemporaneous evidence from the incident that could substitute" for the loss of the alleged video. Moreover, White did not remember if he had retrieved his body camera before proceeding to Angie's, and Det. Veregee testified that he had turned "absolutely everything" over to the prosecution. In other words, there is no evidence that materially exculpatory evidence even existed, much less that it was withheld by the State. Wolfe also has not shown that any video evidence of D.C.'s statement would be materially exculpatory, especially given the overwhelming evidence of Wolfe's guilt.

{¶ 59} Wolfe's seventh assignment of error is overruled.

{¶ 60} In his fourteenth assignment of error, Wolfe asserts that the "trial court refused to admit exculpatory statements recorded by the police officers['] body cam . . . which the alleged victim made during the police investigation." Wolfe refers to D.C.'s alleged statement to a police officer that "It was a black man. He sounded black."

{¶ 61} The admission or exclusion of evidence rests soundly within the trial court's discretion. *State v. Sage,* 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. A trial court's decision concerning the admission or exclusion of evidence will not be reversed absent an abuse of that discretion. *Id.* at 182.

{¶ 62} Hearsay, which is generally inadmissible, "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C).

{¶ 63} "An appellate court will not reverse a judgment for improper exclusion of evidence on a basis of error that is harmless. . . . Courts have not hesitated to find that error is harmless where the excluded evidence is merely cumulative to other compelling evidence." *State v. West*, 2006-Ohio-6259, ¶ 9 (10th Dist.). "Further, an error is harmless if the jury would not have rendered a different verdict had the excluded evidence been admitted at trial." *Id.,* citing *Surovec v. LaCouture*, 82 Ohio App.3d 416 (2d Dist.)

{¶ 64} In support of his argument, Wolfe directs our attention to the testimony of Dayton Police Officer Zachary Boone. Boone testified that he responded to DashMart after 11:00 p.m. on November 15, 2021, based on a report of a "grand theft auto in progress" and call comments that accompanied the dispatch indicating that a child had

been taken with the vehicle. Other officers were already on scene, and Officer Boone "took the responsibility of trying to locate the vehicle's [identifying] information." He learned from S.C. that the vehicle had been rented by her friend and that it was a red Hyundai Kona with a Florida license plate. Boone stated that another officer brought D.C. to the scene around the time Boone arrived there.

{¶ 65} During Boone's cross-examination, Wolfe sought to play the entirety of Boone's body camera footage from DashMart. Outside the presence of the jury, the State objected as follows:

[PROSECUTOR]: . . . I don't think it's been properly introduced. Again, I also don't see that he has an exhibit that's specifically marked separate from all the other documents on the flash drive.

In addition to that, I have viewed that body-worn camera, and there are numerous conversations that would constitute hearsay with people at DashMart, with a friend of [S.C.], with S.C.'s son. Those would all be hearsay.

So I would object to it being played without it being properly cut to simply portions that pertain to witnesses we've already heard from.

{¶ 66} The court indicated that "anything from the body-worn camera that would differ in some way might - - and I use might strongly here - - be admissible under certain circumstances. But the wholesale playing of the body camera footage, for the various things that Ofc. Boone testified to today, I'm not necessarily inclined to allow." When asked if there was an identifiable portion of the video that he wanted admitted, Wolfe

stated that he wanted to admit the "original firsthand information being obtained at the scene of the crime by the Dayton Police Department, and the documentation being made there concerning the vehicle registration and information." Wolfe further asserted that Boone had not talked with D.C. himself but heard information as he was "going back and forth from the police cruiser to the alleged victims" while gathering information about the stolen vehicle, and that D.C. had made "inconsistent" statements that a black man had taken the vehicle and that the suspect sounded black. The court advised Wolfe that any statements by D.C. on the video would not be admissible because they were hearsay. When Boone's cross-examination resumed, he was asked whether he had preciously testified that D.C.'s description of the suspect had been on his audio/video camera. He stated that he had said that he did not recall speaking with D.C.; his objective had been "to locate the vehicle information, which obviously was a challenge. And that was where my primary focus was the entire time."

{¶ 67} Notably, Boone did not deny speaking to D.C. at the scene; he stated that he did not recall doing so and had been primarily focused on obtaining information about the vehicle. Even if the video would have impeached Boone's testimony that he did not recall speaking to D.C. at the scene -- such that the court erred in excluding it on the basis of hearsay -- any error was harmless. In other words, even assuming that D.C. had, in fact, told Boone that the suspect was black or sounded black on the video, and if that specific portion of the video had been admitted into evidence, we are unpersuaded that the outcome of the trial would have been different, given the overwhelming evidence of Wolfe's guilt. The alleged statement would also have been cumulative of the other

testimony that officers had been told by D.C. that the suspect was black or sounded black.

**{¶ 68}** Wolfe's fourteenth assignment of error is overruled.

**{¶ 69}** Finally, in his nineteenth assignment of error, Wolfe argues that that the admission of a statement by D.C. on a cruiser camera video violated Wolfe's right to confrontation. The "Sixth Amendment right to confrontation of witnesses does not extend to nontestimonial hearsay." *State v. Brown*, 2022-Ohio-716, ¶ 10 (2d Dist.), citing *State v. Norris*, 2015-Ohio-624, ¶ 13 (2d Dist.), citing *State v. Stahl*, 2006-Ohio-5482, ¶ 21. "Evid.R. 803(2) excludes an excited utterance from the hearsay rule. An excited utterance is '[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.' " *Brown* at ¶ 10.

**{¶ 70}** Prior to Officer White's testimony, the State represented to the court that it intended to play the cruiser camera video recorded at the time White put D.C. into his cruiser. After viewing the video outside the presence of the jury, the court stated:

> Noting for the record, the only statement that the little boy made was, "I'm so scared". And I need to hear, I guess, from the officer. I can see certain things on the video with respect to his breathing, but I would probably need to hear from the officer as to his demeanor. So if the officer were to testify, and the demeanor meets such, then I would allow that one minute clip to be admitted under Evidence Rule 803(2), as an excited utterance. And although it's an out-of-court statement, the witness availability doesn't matter. It was contemporaneous with a startling event.

. . .

. . . He was not questioned by the police in any manner, so there weren't any answers to police questioning at the time.

{¶ 71} Officer White testified that, when he made contact with D.C., the child was "pretty trepidatious," and White "could tell that he was pretty fearful, timid, clearly had just gone through something that left him upset and confused." The video was then played for the jury.

{¶ 72} The trial court did not abuse its discretion in admitting D.C.'s statement as a nontestimonial excited utterance. The statement was made while D.C. was under emotional distress, and Wolfe's right to confront witnesses against him was not violated.

{¶ 73} Wolfe's nineteenth assignment of error is overruled.

**Confrontation of a Victim**

{¶ 74} Wolfe's eighth assignment of error states:

THE TRIAL COURT ERRED WHEN IT DID NOT PUT THE VICTIM ON THE STAND, VIOLATING THE APPELLANT'S RIGHT TO CONFRONTATION AND CROSS EXAMINATION.

{¶ 75} According to Wolfe, D.C. was the only person who could have established the elements of the offense of kidnapping, and Wolfe's constitutional rights were violated by the fact that D.C. did not testify. He asserts that the State obtained a conviction without giving Wolfe the opportunity to confront and cross-examine D.C. The State responds that it had no obligation to call specific witnesses at trial, and its decision not to call D.C. to testify did not violate Wolfe's right to confront witnesses. We agree with the

State.

**{¶ 76}** The Confrontation Clause of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." "The Fourteenth Amendment renders the Clause binding on the States." *Michigan v. Bryant*, 562 U.S. 344, 352 (2011), citing *Pointer v. Texas*, 380 U.S. 400, 403 (1965). The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). Examples of testimonial statements include: ex parte in-court testimony or its functional equivalent, such as affidavits and prior testimony that the defendant was unable to cross-examine, or pretrial statements that the declarants would reasonably expect to be used in a prosecution; extra-judicial statements contained in formal testimonial materials such as depositions, prior testimony, or confessions; and statements made under circumstances that would lead an objective witness to believe that the statement would be available for use at a later trial. *Id*. at 51-52. Statements made to police officers during an ongoing emergency are generally not considered testimonial. *State v. Jones*, 2023-Ohio-380, ¶ 84 (8th Dist.), citing *Davis v. Washington*, 547 U.S. 813 (2006) (whether a statement is testimonial depends on the "primary purpose" of the statement).

**{¶ 77}** Wolfe's reliance upon the Confrontation Clause is misplaced. The admitted statements by D.C. were non-testimonial; they were made in the course of an ongoing emergency, namely his kidnapping and the theft of S.C.'s car, and were exceptions to the hearsay rule. We note that in *State v. Evans,* 2008-Ohio-2032 (8th

Dist.), the Eighth District held that the minor victim's failure to testify did not render the evidence insufficient or preclude a conviction for kidnapping. *Id.* at ¶ 95-96. Other witnesses testified about the events, and their testimony was sufficient to support the conviction. *Id.* The same is true here. Ohio law allows for convictions to be sustained based on corroborative evidence from other sources, even in the absence of the victim's direct testimony. Wolfe's eighth assignment of error is overruled.

**Identification Evidence at Suppression Hearing**

{¶ 78} Wolfe's ninth assignment of error states:

THE TRIAL COURT VIOLATED THE APPELLANT'S RIGHT TO DUE PROCESS OF LAW AND CROSS EXAMINATION WHEN THE TRIAL COURT FAILED TO PUT THE WITNESS WHO MADE AN I.D. ON THE WITNESS STAND AT THE HEARING ON A MOTION TO SUPPRESS EYEWITNESS IDENTIFICATION.

{¶ 79} Wolfe asserts that the bartender at Angie's, who identified him by means of a photo array prepared by the police, should have been required to testify at the October 27, 2022 suppression hearing. Because she did not, he asserts that the trial court deprived him of the right to suppress an illegally-obtained eyewitness identification. The State responds that, because the pretrial identification process utilized by law enforcement officers was not unduly suggestive, Wolfe's right to due process was not violated, and there was no need to call the bartender as a witness at the suppression hearing. We agree with the State.

{¶ 80} Due process requires suppression of pretrial identification of a suspect "only

if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 197-198 (1972). "The defendant must first show that the identification procedure was unduly suggestive." *State v. Frazier*, 2016-Ohio-727, ¶ 17. " 'A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection.' " *Id.,* quoting *State v. Adams*, 2015-Ohio-3954, ¶ 208. "If the pretrial identification procedure was not unfairly suggestive, any remaining questions as to the identification's reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required." *Id.*, quoting *Adams* at ¶ 209; *State v. Williams*, 2015-Ohio-1403, ¶ 13 (2d Dist.). "If, on the other hand, the defendant shows that the pretrial identification procedure was unduly suggestive, the court must then consider whether the identification, viewed under the totality of the circumstances, is reliable despite the suggestive procedure." *Id.* at ¶ 18. "In reviewing the likelihood that the circumstances resulted in a misidentification, courts consider the opportunity of the witness to view the perpetrator at the time of the offense, the witness's degree of attention, the accuracy of the witness's prior description of the perpetrator, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.,* citing *Biggers* at 199-200; *Manson v. Brathwaite*, 432 U.S. 98 (1977); *State v. Chaffin*, 2014-Ohio-2671, ¶ 16 (2d Dist).

{¶ 81} "Reliability of the pretrial identification is the linchpin in determining its admissibility." *Frazier* at ¶ 19, citing *Manson* at 114. " 'So long as the identification possesses sufficient aspects of reliability, there is no violation of due process.' " *Id.,*

quoting *State v. Sherls*, 2002 WL 254144, *3 (2d Dist. Feb. 22, 2002).

**{¶ 82}** We review a trial court's refusal to suppress a pretrial identification for an abuse of discretion. *State v. Wilson*, 2009-Ohio-1038, ¶ 19 (2d Dist.). " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." (Citation omitted). *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). It is well-settled that most abuses of discretion "will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id*. "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id*.

**{¶ 83}** Detectives Veregee and Hofacker testified at the suppression hearing. Veregee had used a folder system to prepare a photo lineup in accordance with R.C. 2933.83. He utilized Justice Web to auto-populate photos of individuals similar in appearance to Wolfe. He used 10 folders, five of which had photos and five of which did not, and he numbered them one through 10, alternating between folders with and without photos. He prepared the necessary instructions and asked Det. Hoffacker to administer the photo array. Hofacker had no knowledge of the case. He presented the photo array to the Angie's bartender on December 9, 2021. Although Det. Veregee accompanied Hofacker to Angie's, the detectives did not discuss the matter, and Veregee remained in a separate part of the bar while Hofacker administered the photo array.

**{¶ 84}** Det. Hofacker testified that he was familiar with the folder system, having administered many such line-ups. He read the instructions to the bartender and initialed them to so indicate, and he signed his name to reflect that he was the "blind

administrator." The bartender chose photo number 7, the photo of Wolfe. At Hofacker's instruction, the bartender wrote that number 7 was the person she served before the incident, and she was "9 out of 10 on certainty." She signed and printed her name. Hofacker's interaction with the bartender lasted approximately eight minutes.

{¶ 85} The trial court reviewed an audio recording of the photo identification, noting that the bartender took less than a minute to go through the folders and identify picture number 7. The court denied the motion to suppress the identification, stating:

> In reviewing the credible testimony presented at the hearing, as well as the audio recording in State's Exhibit 2, the court finds there was nothing unduly suggestive about the process or procedure utilized in showing [the bartender] the photographs utilizing the folder system. The folders were prepared in accordance with R.C. 2933.83 and all procedures were followed when showing [the bartender] the folders. The Court finds that the Defendant has not demonstrated that the identification procedure was unduly suggestive. The identification by [the bartender], viewed under the totality of the circumstances, was reliable.

{¶ 86} We have reviewed the testimony at the suppression hearing and, in our view, the trial court correctly found that the identification procedure was not unduly suggestive. Further, although the bartender was not called to testify at the suppression hearing, she did testify at trial and was subject to cross-examination. Wolfe's ninth assignment of error is overruled.

{¶ 87} Wolfe's tenth assignment of error states:

THE TRIAL COURT COMMITTED PREJUDICIAL PLAIN ERROR WHEN IT IMPROPERLY INSTRUCTED THE JURY OF THE WEIGHT OF CIRCUMSTANTIAL EVIDENCE IN COMPARISON WITH DIRECT EVIDENCE.

{¶ 88} Wolfe asserts that the State did not produce any direct evidence of kidnapping and theft, and he asks us to reverse his convictions based on plain error. We note that Wolfe filed objections to the State's proposed jury instructions, arguing that the jury instructions erroneously instructed the jurors that circumstantial and direct evidence were "of equal weight." He contends that he "preserved" his objections to the instructions at the end of the trial. As relevant to this argument, the court instructed the jury that it "may consider both direct and circumstantial evidence. Direct and circumstantial evidence are of equal weight."

{¶ 89} In Ohio, it is well-established that "a defendant may be convicted solely on the basis of circumstantial evidence." *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988). "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. "Circumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved. . . .' " *Nicely* at 150, quoting *Black's Law Dictionary* (5 Ed. 1979).

"Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the

jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." [*Jenks* at 272]. " 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.' " *State v. Hawthorne*, [2011-Ohio-6078 (8th Dist.)], quoting *Michalic v. Cleveland Tankers, Inc.*, [364 U.S. 325, 330 (1960).]

*State v. Rodano*, 2017-Ohio-1034, ¶ 36 (8th Dist.). Based upon the foregoing, Wolfe's tenth assignment of error is overruled.

### Record on Appeal

{¶ 90} Wolfe's eleventh assignment of error states:

THE TRIAL COURT VIOLATED DUE PROCESS OF LAW AND EQUAL PROTECTION OF THE LAW WHEN IT DID NOT TRANSCRIBE A COMPLETE RECORD FOR APPEAL AND REFUSED TO SUPPLEMENT THE RECORD PURSUANT TO APP.R. 9(E).

{¶ 91} Wolfe asserts that the trial court failed to transcribe the jury instructions and include them in the record. However, the jury instructions were recorded in Volume V of the trial transcript at pages 1040-1054. Wolfe's eleventh assignment of error is overruled.

### Hearing on Motion to Suppress Surveillance Video

{¶ 92} Wolfe's twelfth assignment of error states:

THE TRIAL COURT VIOLATED THE APPELLANT'S RIGHT TO A SUPPRESSION HEARING ON A MOTION TO SUPPRESS VIDEO EVIDENCE.

{¶ 93} Wolfe argues that the trial court "deprived [him] of a suppression hearing which would have definitely resulted in the suppression of tampered evidence," namely surveillance videos from Angie's Tavern. The State responds that a motion to suppress is not the proper vehicle to challenge the authenticity of videotape evidence. We agree with the State.

{¶ 94} The Third District has observed:

The Fourth Amendment to the United States Constitution . . . provides for "[t]he right of the people to be secure . . . against unreasonable searches and seizures[.]" If evidence is obtained through actions that violate an accused's Fourth Amendment rights, exclusion of the evidence at trial is mandated. However, the constitutional proscriptions of the Fourth Amendment and the exclusionary rule apply only to government action and not to the actions of private persons. Evidence discovered and seized by private persons is admissible in a criminal prosecution regardless of whether such evidence was obtained by legal or illegal methods, so long as there is no government participation in the search.

State v. Meyers, 2001-Ohio-2282, ¶ 41 (3d Dist.).

{¶ 95} "A 'motion to suppress' is defined as a '[d]evice used to eliminate from the trial of a criminal case evidence which has been secured illegally, generally in violation of

the Fourth Amendment (search and seizure), the Fifth Amendment (privilege against self incrimination), or the Sixth Amendment (right to assistance of counsel, right of confrontation etc.), of U.S. Constitution.' " *State v. French*, 72 Ohio St.3d 446, 449 (1995) quoting *Black's Law Dictionary* (6 Ed.1990). Thus, a motion to suppress is the proper vehicle for raising constitutional challenges based on the exclusionary rule first enunciated by the United States Supreme Court in *Weeks v. United States*, 232 U.S. 383 (1914), and made applicable to the states in *Mapp v. Ohio*, 367 U.S. 643 (1961). *French* at 449.

{¶ 96} In its written decision overruling Wolfe's motion to suppress the surveillance video evidence from Angie's, the trial court stated:

Defendant seeks to suppress video evidence obtained from Angie's Bar. Defendant argues that the videos have been altered because the date and time is incorrect and that the video footage itself has been edited. The Defendant admits that he does not own Angie's Bar and has no control over the video recording equipment inside Angie's Bar. The Court explained to the Defendant that he cannot seek to suppress evidence that was not obtained in violation of his [F]ourth [A]mendment rights. Further, the Court explained whether or not the video evidence is admissible will be determined at trial. The Defendant is free to obtain a forensic analyst/expert to testify at trial if he so wishes but a Motion to Suppress is not the proper vehicle to exclude this evidence from being introduced at trial. Therefore, the Defendant's Motion is overruled.

{¶ 97} Wolfe's motion to suppress the video evidence from Angie's was not based upon Fourth Amendment search and seizure principles but rather on the alleged inauthenticity of the evidence. Evid.R. 901 governs the requirement for authentication or identification as a condition precedent to admissibility at trial to ensure that the evidence presented is what its proponent claims it to be. And, as will be discussed further below, the trial court granted Wolfe's motion for an expert in the field of audio/video technology to examine the evidence. The trial court did not err in overruling Wolfe's motion to suppress the video evidence from Angie's. Wolfe's twelfth assignment of error is overruled.

### Right to Compulsory Process

{¶ 98} Wolfe's thirteenth assignment of error states:

THE TRIAL COURT VIOLATED THE APPELLANT'S RIGHT TO COMPULSORY PROCESS.

{¶ 99} Wolfe argues that the trial court violated his right to compulsory process "when it allowed subpoenaed parties to ignore subpoena duces tecum and did not enforce subpoenas" in accordance with Crim.R. 17(G), and then allowed some of the subpoenaed parties in the Dayton Police Department "to quash subpoenas to exculpatory and favorable evidence." He specifically references subpoenas issued on October 18, 2022, and January 9 and 17, 2023. The State responds that "Wolfe was provided with the assistance of standby counsel to consult with Wolfe on legal procedures for enforcing compliance with subpoenas."

{¶ 100} As noted by the Sixth Appellate District:

An accused shall enjoy the right to have compulsory process for obtaining witnesses in the accused's favor under both the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. The right to compulsory process has been described as "the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. . . . This right is a fundamental element of due process of law." [*Washington v. Texas*, 388 U.S. 14, 19 (1967)]. The manner of enforcing the constitutional right to compulsory process is provided by R.C. 2945.45 ("Subpoenas to issue to any county") and Crim.R. 17.

*State v. Santibanaz,* 2023-Ohio-3404, ¶ 13 (6th Dist.)

{¶ 101} "When a subpoena is left at a witness' usual place of residence, or business location, or place of employment, and the witness has actual knowledge of the subpoena, service of summons has been completed." *State v. Fornash*, 2004-Ohio-797, ¶ 10, 15 (12th Dist.) (where there was no evidence that a witness had actual knowledge of a residential subpoena, she had not been properly served and was not required to appear), citing *State v. Castle*, 92 Ohio App.3d 732, 734 (1994); *Denovchek v. Trumbull Cty. Bd. of Commrs.*, 36 Ohio St.3d 14 (1988); Crim.R. 17(D). "A witness's failure to obey a duly served subpoena constitutes contempt of court." *Fornash* at ¶ 10, citing *Castle* at 735.

### October 18, 2022 Subpoenas for Suppression Hearing

{¶ 102} On October 18, 2022, Wolfe issued six subpoenas for witnesses to appear

at the suppression hearing to be held on October 27, 2022, on the issue of identification. As noted above, Detectives Veregee and Hofacker appeared and testified regarding the photo spread compiled and administered by them to the bartender. The only witness whose failure to appear was brought to the court's attention was the bartender at Angie's. The record reflects that an initial subpoena was sent to the bartender at Angie's Tavern on October 18, 2022, because her home address was unknown; the subpoena listed the time to appear as 1:30 p.m. The subpoena requested that the bartender provide testimony and a "driver's license/ State I.D." A second subpoena was sent to the bartender on October 19, 2022, at Angie's. The second subpoena did not list a time to appear and, in addition to the forms of identification to be produced, it listed check stubs from the week of October 15, 2021. Both subpoenas list phone numbers for the Sheriff to call the prosecutor's office to obtain the bartender's home address. The docket reflects two returns of subpoena on October 21, 2022; both indicated a failure of service because the bartender was no longer employed at Angie's.

{¶ 103} When asked by the court if the State had a home address for the bartender, the prosecutor stated she believed the only known address for her was at Angie's. Angie's address on Watervliet was also the only address for the bartender listed on the State's January 9, 2023 written list of witnesses. Wolfe asked the court to dismiss the charges against him based upon the bartender's absence, asserting a failure of compulsory process.

{¶ 104} Because there was no evidence that the bartender had been properly served, she was not required to appear. Wolfe did not argue that the bartender had

actual knowledge of the subpoena. Wolfe could have requested a continuance to locate the bartender, but he did not do so. *See State v. Hand*, 2008-Ohio-1870, ¶ 22 ("The trial court did not err in failing to assist Hand in securing [a witness's] appearance where personal service had not been obtained. Hand's right to compulsory process was not violated. Although Counsel could have requested a reasonable continuance to obtain personal service, no such request was made.") Wolfe's argument as to this subpoena is without merit.

January 9, 2023 Subpoenas for Pretrial Conference

**{¶ 105}** Wolfe issued multiple subpoenas on January 9, 2023, for various witnesses to appear and produce documents at the final pretrial conference on January 19, 2023. At that conference, "Captain Cook from Green County" appeared in response to a subpoena. The court stated, "At a final pre-trial we usually go over the progression of how the trial will occur, on what days it occurs, the time, and any last-minute issues." She advised Wolfe that no hearing was being held that day that required anyone's testimony.

**{¶ 106}** The court asked Wolfe why Cook had been subpoenaed for "a case that involved the City of Dayton." Wolfe responded that he had issued multiple subpoenas to obtain records "for the purpose of time limitations and other relevant matters that I've raised in the past motion to discharge, as well as the evidence that I want entered into the record for the upcoming motion for discharge for the time limitations that I plan to bring before the court." The court indicated that it had overruled Wolfe's motion to dismiss and there wasn't going to be a hearing on it; there would only be a trial on the indictment.

After leaving documents with Wolfe, Captain Cook departed, and the court confirmed that no one else had appeared pursuant to a subpoena.

{¶ 107} The following exchange occurred at the pretrial conference:

WOLFE:   Today I've subpoenaed more records over here.   I'd like to find out if they showed up at this building for - -

THE COURT:   If they were subpoenaed and they showed up today, they would've been directed here.

WOLFE:   In this subpoena I've subpoenaed all of the records from the police station.   These are some of the requests that I've made through discovery.   I'd like to be able - - and I'm still requesting from the Prosecution these things as well as trying to subpoena.   And it includes all the work histories, disciplinary records.   It also includes the original video footage, inside and out, from Angie's Tavern.   It also includes the original camera footage and body cam video which should have been made at the interview with [the bartender].

THE COURT:   Let me ask you something.   Are you saying that the State has the additional discovery that they have not provided to you, or are you trying to get discovery that you think is available?

WOLFE:   Yes.   Both. . . .

. . .

WOLFE: Well, what does the Court normally to do [sic] when somebody doesn't respond to a subpoena for records or for showing up at a hearing?

THE COURT: Well, what I can tell you is it would be incumbent upon the attorney involved to request certain things from the Court if someone doesn't comply with subpoenas. So I can't provide that legal advice to you.

WOLFE: And I am requesting that you - - that the Court would contact those subpoenaed through the records of - -

THE COURT: Mr. Wolfe, this Court is not going to contact who you have subpoenaed and ask them to appear.

WOLFE: Are they allowed to just ignore my subpoenas because I'm self-represented?

THE COURT: I am not going to provide any legal advice to you on that.

WOLFE: But I think I have the power of compulsory, just like a regular attorney does. And that's what I'm bringing to the Court's attention today, is I have subpoenaed these things and they didn't appear today to bring these records.

. . .

THE COURT: So if there are motions that you need to have filed, I would ask you to file them and I'll rule on them. If there's another time that you would like us to meet to go over more of these things, I will do that as well. I just can't - - I don't know how much longer you're going to be.

. . .

WOLFE: So this is a - - presents a - - I'm going to try to reissue those subpoenas. I'm going to try to work with the standby counsel to get the

things I need.   . . .

{¶ 108} Crim.R. 17 provides for subpoenas to be issued for a hearing or a trial, not a final pretrial conference.   Subpoenas for a pretrial are not recognized, and Wolfe indicated that he would re-issue the subpoenas before trial with the help of standby counsel.   His argument as to these subpoenas is without merit.

January 17, 2023 Subpoenas

{¶ 109} Finally, Wolfe issued multiple subpoenas for the first day of trial on January 30, 2023.   He subpoenaed: an attorney from the Greene County Public Defender's Office, requesting video of a probation revocation hearing from a 2021 case; the Montgomery County Clerk of Court, requesting audio and video of Wolfe's court proceedings, including his motion to suppress hearing; a Montgomery County Jail employee, requesting Wolfe's medical records; the "Jail Administrator" (two subpoenas), requesting all mail records for Wolfe during his incarceration; the Dayton Municipal Court Clerk of Courts, requesting audio and video recordings of his arraignment and preliminary hearing; and Officer Peters of the Xenia Police Department, requesting video of Wolfe's arrest and "original police reports, original police telephone calls related to arrest." Wolfe also subpoenaed Det. Veregee of the Dayton Police Department, requesting his "employment ID, all original detective work product, police reports.   Names of all officers responding to alleged crime scenes on 11/15/2023, all original police reports (paper format)."   Finally, he subpoenaed the Dayton Police "records supervisor," requesting the "original video/audio footage from Angie's Tavern on 11/15/2021."

{¶ 110} A motion to quash was filed by the Dayton Police Department on January

25, 2023. The court scheduled an immediate hearing on the motion to quash for January 26, 2023, and it subsequently granted the motion. Regarding the request issued to the records supervisor, the court found that video from Angie's had been provided to Wolfe in the manner "provided and allowed" by Crim.R. 16, i.e., Crim.R. 16 did not entitle Wolfe to original surveillance videos. As to Det. Veregee, the court found that everything requested had been provided to. Wolfe as part of the discovery in the case, pursuant to Crim.R. 16, "as verified by the exhibits that were admitted by the State for this hearing, and as well as verified by standby counsel."

{¶ 111} The court reviewed the several subpoenas issued by Wolfe and discussed under this assignment of error; it found that they constituted a "fishing expedition," sought material irrelevant to his guilt or innocence, or that there had been no failure to comply before the first day of trial. We agree with the trial court that video of a prior revocation hearing in another matter, audio and video of the proceedings herein, Wolfe's medical and mail records from the jail, and video of Wolfe's arrest were not relevant to the events underlying the charges in this case or Wolfe's guilt or innocence.

{¶ 112} Wolfe's thirteenth assignment of error is overruled.

### Sufficiency of the Evidence

{¶ 113} Wolfe's fifteenth assignment of error states:

TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR ACQUITTAL UNDER CRIM.R. 29. THE STATE VIOLATED DUE PROCESS OF LAW WHEN THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO ESTABLISH BEYOND A REASONABLE

DOUBT THE ELEMENTS NECESSARY TO SUPPORT AND SUSTAIN A CONVICTION.

{¶ 114} Wolfe again asserts that D.C. was "the only person who could establish the elements of the offense of kidnapping" and theft of the vehicle. As we discussed above, we disagree.

{¶ 115} "Crim.R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction for the charged offense." *State v. White*, 2014-Ohio-1446, ¶ 9 (2d Dist.). " 'Reviewing the denial of a Crim.R. 29 motion therefore requires an appellate court to use the same standard as is used to review a sufficiency of the evidence claim.' " *Id.*, quoting *State v. Witcher*, 2007-Ohio-3960, ¶ 20 (6th Dist.).

{¶ 116} In reviewing a challenge to the sufficiency of evidence, we determine whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, citing *Jackson v. Virginia*, 443 U.S. 307 (1979). Our review is not to determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring).

{¶ 117} The elements of kidnapping and grand theft (auto) are set forth under Wolfe's third assignment of error. If believed, the evidence against Wolfe supported his

conviction. S.C. testified that D.C. was in the backseat of her vehicle when it was stolen from DashMart. D.C. was found almost two miles away at Carmel's after Wolfe ordered him out of the vehicle. When Wolfe was arrested, he had the keys to S.C.'s stolen vehicle in his possession, and S.C.'s car was found nearby. Although Wolfe maintains that the kidnapper was black or sounded black (allegedly based on a statement from D.C.), the evidence did not support such a conclusion. Det. Veregee testified that, viewing the video, it was clear that the person who got in the car was not black. The bartender at Angie's identified Wolfe in a folder system as the person who did not pay his tab just before the theft of S.C.'s vehicle. The jury viewed video of the theft of the vehicle.

{¶ 118} Viewing the evidence in a light most favorable to the State, a rational juror could have found the essential elements of kidnapping and grand theft (auto) proven beyond a reasonable doubt. Wolfe's argument that D.C. was the only person who could establish the elements of these offenses is without merit.

{¶ 119} Wolfe's fifteenth assignment of error is overruled.

### Constitutionality of Reagan Tokes Act

{¶ 120} Wolfe's sixteenth assignment of states:

THE TRIAL COURT VIOLATED THE APPELLANT'S CONSTITUTION[AL] RIGHTS WHEN THE COURT SENTENCED THE APPELLANT TO A SENTENCE THAT ALLOWS THE PRISON TO INCREASE THE PRISON TERM.

{¶ 121} Under this assignment of error, Wolfe challenges the constitutionality of the Reagan Tokes Act. However, we have consistently held that the Reagan Tokes Act,

R.C. 2929.144, which governs the determination of an indefinite prison term for certain offenses, does not violate due process, the right to trial by jury, or the separation of powers doctrine. *See State v. Glaze*, 2022-Ohio-4549, ¶ 9 (2d Dist.) (citing 12 cases examining and rejecting such arguments). Wolfe's sixteenth assignment of error is overruled.

### Sentencing

{¶ 122} Wolfe's seventeenth assignment of error states:

THE TRIAL COURT ERRORED AT SENTENCING.

{¶ 123} Wolfe asserts that the trial court erred in sentencing him to "the maximum minimum sentence and the maximum longest term for a single felony or combination of felonies rising out of a single transaction or event." He argues that the trial court failed to consider relevant factors pursuant to R.C. 2929.12(C), namely that the "crime alleged was the least serious form of offense, and conduct was alleged that is less serious than the conduct which usually constitutes the offense of kidnapping." Wolfe points out that he did not have a gun or act violently, make threats, cause or threaten physical harm, or have any physical contact with the victim. He also asserts that the court erred in considering his adjudications as a juvenile.

{¶ 124} "When reviewing felony sentences, a court of appeals must apply the standard of review set forth in R.C. 2953.08(G)." *State v. Williams*, 2022-Ohio-2897, ¶ 18 (2d Dist.), citing *State v. Farra*, 2022-Ohio-1421, ¶ 73 (2d Dist.). Under that statute, an appellate court may increase, reduce, or modify a sentence, or vacate it altogether and remand for resentencing, "only if it 'clearly and convincingly' finds either (1) that the record

does not support certain specified findings or (2) that the sentence imposed is contrary to law." *State v. Worthen*, 2021-Ohio-2788, ¶ 13 (2d Dist.).

{¶ 125} We may not independently "weigh the evidence in the record and substitute [our] judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *State v. Bartley*, 2023-Ohio-2325, ¶ 9 (2d Dist.), quoting *State v. Jones*, 2020-Ohio-6729, ¶ 42. "The inquiry is simply whether the sentence is contrary to law." *Id.* "A sentence is contrary to law when it falls outside the statutory range for the offense or if the sentencing court does not consider R.C. 2929.11 and 2929.12." *Id.*, citing *State v. Dorsey*, 2021-Ohio-76, ¶ 18 (2d Dist.). Finally, R.C. 2929.12(D)(2) mandates that juvenile adjudications be factored into the recidivism risk.

{¶ 126} Wolfe's sentence for kidnapping -- an indefinite sentence of 8 to 12 years for a felony of the second degree -- was within the statutory range and not contrary to law. R.C. 2929.14(A)(2)(a). His 18-month sentence for grand theft, a felony of the fourth degree, was also within the statutory range and not contrary to law. R.C. 2929.14(A)(4). At sentencing, the trial court indicated that it had considered the relevant sentencing factors in R.C 2929.11 and 2929.12 in imposing sentence.

{¶ 127} Wolfe's seventeenth assignment of error lacks merit and is overruled.

### Speedy Trial

{¶ 128} Wolfe's eighteenth assignment of error states:

THE TRIAL COURT VIOLATED THE APPELLANT'S RIGHT TO SPEEDY TRIAL.

**{¶ 129}** "Speedy-trial provisions are mandatory, and, pursuant to R.C. 2945.73(B), a person not brought to trial within the relevant time constraints 'shall be discharged,' and further criminal proceedings based on the same conduct are barred." *State v. Sanchez*, 2006-Ohio-4478, ¶ 7, quoting R.C. 2945.72(D). In Ohio, the prosecution is required to bring a felony offender to trial within 270 days of arrest. R.C. 2945.71(C)(2). Each day during which the accused is held in jail in lieu of bail on the pending charge must be counted as three days. R.C. 2945.71(E). "This 'triple count' provision applies only when the defendant is being held in jail solely on the pending charge." *Sanchez,* citing *State v. MacDonald*, 48 Ohio St.2d 66 (1976), paragraph one of the syllabus (construing former R.C. 2945.71(D), now (E)).

**{¶ 130}** R.C. 2945.72(C) states that the time within which the accused must be brought to trial may be extended by "any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused" upon the accused's request as required by law. R.C. 2945.72(E) and (H) state that the time within which an accused must be brought to trial may be extended by "[a]ny period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused" or by "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion."

**{¶ 131}** The record reflects the following: Wolfe was indicted on February 15, 2022. A warrant for removal from the Greene County Jail, where Wolfe was being held on a separate matter, was issued on February 16, 2022. Wolfe was arraigned on March 3,

2022, and the court entered a plea of not guilty on his behalf. Counsel was also appointed for Wolfe.

{¶ 132} A warrant for removal from the Green County Jail was issued on March 7, 2022, for a scheduling conference on March 17, 2022. Wolfe's motion for a continuance from March 17, 2022, to April 7, 2022, was granted. On March 30, 2022, Wolfe's counsel filed a motion to withdraw as counsel. On April 11, 2022, new counsel was appointed to represent Wolfe. Several requests for continuances were subsequently granted at defense counsel's request, which continued the matter from April 7 to May 12, 2022.

{¶ 133} On May 12, 2022, the court set a motion to suppress hearing for June 24, 2022. (Wolfe's motion to suppress was filed on May 20, 2022.) On June 10, 2022, Wolfe filed a motion for new counsel. The trial court granted this motion, and on June 24, 2022, it appointed a third attorney for Wolfe. On June 29, 2022, Wolfe filed a motion for relief from prejudicial joinder and a motion to dismiss the violent offender specification attendant to the kidnapping count. On August 9, 2022, the court overruled both motions. On August 12, 2022, Wolfe's attorney for filed a motion to withdraw; the trial court granted this motion and appointed a fourth attorney on August 17, 2022. The suppression hearing previously scheduled for June 24, 2022, was rescheduled to October 6, 2022. On September 12, 2022, Wolfe filed a motion to release his attorney and to represent himself; he signed a waiver of counsel on September 27, 2022. The suppression hearing was rescheduled to October 27, 2022.

{¶ 134} Wolfe filed 28 additional motions between October 3, 2022, and February 3, 2023. As the trial court noted in its decision of December 28, 2022, Wolfe's statutory

speedy trial time was extended each time he requested a continuance and when he filed various motions. Pursuant to R.C.2945.72 (E), Wolfe's speedy trial time was tolled while his motions were pending. His speedy trial time was also tolled pursuant to R.C. 2945.72(C) for the time periods during which he did not have counsel at his request or sought new counsel, when the court was required to appoint new counsel to represent him. Because Wolfe was held in Greene County on an unrelated case until May 8, 2022, the triple count provision did not apply from his arraignment on March 2, 2022 through May 8, 2022. Fifteen days of speedy trial time passed between March 2 and March 17, 2022; then, Wolfe requested a series of continuances which tolled the time through May 12, 2022. The triple count provision applied to eight days that passed between May 12 and May 20, 2022, for a total of 24 days. Wolfe then filed multiple motions. On December 28, 2022, the court overruled several motions to dismiss filed by Wolfe.

{¶ 135} In sum, 15 days counted against the State from March 2, 2022, to March 17, 2022, when Wolfe filed the first of a series of continuances. The time was tolled from March 17, 2022, through May 12, 2022. Eight days then elapsed between May 12 and May 20, 2022, at triple count, for 24 days. Time was again tolled on May 20, 2022, when Wolfe filed a motion to suppress. The court issued rulings on multiple motions through December 28, 2022. Wolfe had filed a request for jury instructions on October 24, 2022; the State filed proposed jury instructions on January 24, 2023, to which Wolfe objected, and the issue was addressed at trial. The trial was held in late January and early February. Thus, time was tolled from May 20, 2022, until trial commenced. Because of Wolfe's numerous motions and changes of counsel, only 39 days counted against the

State before trial commenced.   As such, Wolfe's right to a speedy trial was not violated.

{¶ 136} The eighteenth assignment of error is overruled.

### Right to Hire Experts and Private Investigator

{¶ 137} Finally, Wolfe's twentieth assignment of error states:

THE APPELLANT'S RIGHTS WERE VIOLATED TO CALL WITNESSES WHEN THE TRIAL COURT REFUSED TO PROVIDE A PLATFORM FOR THE APPELLANT TO OBTAIN AN EXPERT WITNESS, PRIVATE INVESTIGATOR AND THE STANDBY COUNSEL REFUSED TO ASSIST.

{¶ 138} Wolfe asserts that a "self-represented defendant retains all other substantial rights, and court must ensure they are not forfeited because the defendant chooses to represent himself."   He argues that his convictions should be reversed for violations of due process, his right to call witnesses and present evidence, and his right to a fair trial.

{¶ 139} As noted above, as a pro se litigant, Wolfe is held to the same standard as litigants who are represented by counsel.   The record reflects that on November 1, 2022, the trial court granted Wolfe's motion for a private investigator to assist in trial preparation, and on December 19, 2022, the court granted Wolfe's motion for an expert witness in the field of audio/video technology.   Wolfe acknowledges that the court

granted his motions for an expert witness and an investigator. The court approved the sum of $1,500 for each purpose. It was up to Wolfe whether or not to avail himself of the sums provided for his assistance; there is no evidence that the court interfered with his ability to do so. Wolfe's twentieth assignment of error is overruled.

## Conclusion

{¶ 140} Having addressed all of Wolfe's assignments of error, we will reverse the judgment of the trial court only as to sentencing; the matter will be remanded for resentencing pursuant to the Reagan Tokes Act, for proper imposition of the Tier 1 sex offense/child victim offender designation, and for proper consideration of the issue of restitution. In all other respects, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.